## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IRWIN MORTGAGE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TERRA FINANCIAL CONSULTING | ) |
| CORPORATION, GALYNA SVENTEK, PETRO | ) |
| KYSELYTSYA, ALEXEY Y. KAPLAN a/k/a | ) |
| ALEX KAPLAN, and ALEKSANDER | ) |
| KULCHITSKIY, | ) |
| | ) |
| Defendants. | ) |

Case No.

```
FILED: MAY 23, 2008
08 cv 3032   JH
JUDGE SHADUR
MAGISTRATE JUDGE COLE
```

### COMPLAINT

NOW COMES IRWIN MORTGAGE CORPORATION ("IRWIN"), by and through its

counsel, and for its Complaint against TERRA FINANCIAL CONSULTING CORPORATION

("TERRA"), GALYNA SVENTEK ("SVENTEK"), PETRO KYSELYTSYA ("KYSELYTSYA"),

ALEXEY Y. KAPLAN a/k/a ALEX KAPLAN ("KAPLAN"), and ALEKSANDER KULCHITSKIY

("KULCHITSKIY") (collectively, the "Defendants"), states as follows:

### PARTIES

1.       IRWIN is an Indiana corporation with its principal place of business at 10500 Kincaid

Dr., Fishers, IN 46037.

2.       Upon information and belief, TERRA is an Illinois corporation with its principal

place of business at 4043 Dempster St., Suite C, Skokie, IL 60076.

3.       Upon information and belief, SVENTEK is a citizen of the State of Illinois who

resided at all relevant times at 632 Pleasure Drive, Mundelein, IL 60060, or at 415 E. Wilson St.,

Palatine, IL 60074, and who now resides upon information and belief either at 3847 N. Octavia Ave.,

Chicago, IL 60634, or at 12136 W. Ashby Dr., Peoria, AZ 85383.

4.      Upon information and belief, KYSELYTSYA is a citizen of the State of Illinois who resided at all relevant times at 632 Pleasure Drive, Mundelein, IL 60060, or at 415 E. Wilson St., Palatine, IL 60074, and who now resides upon information and belief either at 3847 N. Octavia Ave., Chicago, IL 60634, or at 12136 W. Ashby Dr., Peoria, AZ 85383.

5.      Upon information and belief, KAPLAN is an attorney who maintains his principal place of business at 4043 Dempster St., Suite C, Skokie, IL 60076. Upon information and belief, KAPLAN is a shareholder of TERRA, and was at all relevant times responsible for managing TERRA's day to day operations.  Kaplan Law Offices, P.C., KAPLAN's law firm, is not a party to this suit.

6.      Upon information and belief, KULCHITSKIY is a citizen of the State of Illinois who resides at 1010 N. Western Ave., Chicago, IL 60622.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 insomuch as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs. This Court has supplemental jurisdiction over IRWIN's claim against KULCHITSKIY pursuant to 28 U.S.C. § 1367, because the KULCHITSKIY Note is subject to repurchase by TERRA under Count III of the Complaint.

8.      This Court has venue over this matter pursuant to 28 U.S.C. §1391 because all but two of the Defendants reside in this district, and the other two Defendants – SVENTEK and KYSELYTSYA – are subject to personal jurisdiction here.

## BACKGROUND

9.     This Complaint relates to a mortgage fraud flipping scheme perpetrated by certain of the defendants as more specifically set forth herein.

10.     On January 25, 2006, TERRA, as broker, and IRWIN, as lender, entered into an agreement (the "Agreement") for IRWIN to fund certain loan transactions ("Notes") secured by mortgages, originated by TERRA.  A copy of the Agreement is attached hereto as Exhibit 1.

11.     In the ordinary course of its business, IRWIN assigned the Notes and related mortgages originated by TERRA to other banks and finance companies, with recourse against IRWIN under certain circumstances.

12.     Under the Agreement, TERRA agreed to repurchase any Notes that IRWIN's assignees required it to repurchase due to a breach of representation and warranty under the Agreement.

13.     Upon information and belief, some time before August 9, 2006, SVENTEK contacted Olga Matyuk, a non-party and an employee at TERRA, to arrange mortgage financing for SVENTEK's purchase of real property.

14.     On August 22, 2006, SVENTEK, as Buyer, and Natalya Yatsenko, a non-party, as Seller, entered into a contract for the sale of the real property known as 5842 Main St., Morton Grove, IL 60053 (the "Property"), for a sales price of $895,000.00.  A true and correct copy of the contract is attached hereto as Exhibit 2.

15.     On the face of the contract, KAPLAN is identified as counsel for the Seller.  TERRA is identified as the Buyer's lender.

16.     On August 22, 2006 and September 15, 2006, Olga Matyuk, an employee of TERRA

and a non-party to this suit, interviewed SVENTEK for the purpose of completing her loan application, which was then submitted by TERRA to IRWIN for approval of two notes and mortgages with respect to the Property.

17.     Upon information and belief, KAPLAN knew that SVENTEK's loan application was submitted to IRWIN for approval.

18.     On or about September 15, 2006, SVENTEK, as Borrower, and IRWIN, as Lender, entered into a Note and Mortgage in the amount of $595,000.00 (the "First Note") for the property known as 5842 Main St., Morton Grove, IL 60053.  See Exhibit 3 attached hereto.

19.     Also on September 15, 2006, SVENTEK, as Borrower, and IRWIN, as Lender, entered into a Note and Mortgage in the amount of $300,000.00 (the "Second Note") for the property known as 5842 Main St., Morton Grove, IL 60053.  See Exhibit 4 attached hereto.

20.     The First and Second Notes were originated by TERRA.

21.     In the Agreement, which was signed by KAPLAN on behalf of TERRA, TERRA represents and warrants that neither TERRA nor any of its employees or officers are receiving any consideration other than TERRA's fees for brokering the Borrower SVENTEK's loan.

22.     TERRA failed to disclose to IRWIN that KAPLAN also represented the Seller in the SVENTEK transaction.

23.     In conjunction with the First and Second Notes, SVENTEK completed a uniform residential loan application with the assistance of TERRA, in which she represented that she was unmarried.

24.     SVENTEK further represented via affidavit that she was unmarried.  A copy of the affidavit is attached hereto as Exhibit 5.

4

25.    SVENTEK represented that she intended to occupy the Property as her principal residence.

26.    SVENTEK represented in the loan application that her monthly income was $17,500.00.

27.    The representations set forth in Paragraphs 23-26 were false.

28.    SVENTEK was at all relevant times married to KYSELYTSYA.

29.    SVENTEK defaulted on her first payments due under the First and Second Notes. IRWIN's assignees have required IRWIN to repurchase the First and Second Notes. IRWIN has demanded that TERRA repurchase the First and Second Notes, but TERRA has failed to do same.

30.    IRWIN, in funding the First and Second Notes, reasonably relied on SVENTEK's representations in not requiring SVENTEK's husband, KYSELYTSYA, to co-sign the notes and related mortgages for the Property, and by determining that she was financially capable of paying the debt based on her income.

31.    Upon information and belief, in October and early November 2006, SVENTEK purchased at least two additional properties, incurring approximately $700,000.00 in additional debt. Upon information and belief, SVENTEK made the same misrepresentations as set forth in Paragraphs 23-26 to obtain loans to finance the purchase fo the additional properties. Upon information and belief, SVENTEK took advantage of the "gap period" where her interest in the Morton Grove Property was not yet reported to title search companies, such that her debt to IRWIN would not have been reported in a title search of properties under her name.

32.    Upon information and belief, KYSELYTSYA purchased five real properties from November 2006 to February 2007, representing himself as an unmarried man, when in fact he was

5

at all relevant times married to SVENTEK.

33.    KYSELYTSYA and SVENTEK agreed to exploit the "gap period" for the purpose of closing as many purchases of real property as possible.  Neither KYSELYTSYA nor SVENTEK had any intention when they purchased a property of fulfilling any of their financial obligations with respect thereto, as the goal of the scheme was to be compensated by the sellers or other interested parties in the transactions, or, alternatively, to "flip" the properties to make a profit.

34.    KULCHITSKIY sought a loan through TERRA.

35.    On or about April 27, 2006, KAPLAN, on behalf of TERRA, interviewed KULCHITSKIY for the purpose of completing his loan application, which was then submitted to IRWIN for approval.  Upon information and belief, KULCHITSKIY overstated his income on his loan application.

36.    IRWIN approved the loan.

37.    On or about April 27, 2006, KULCHITSKIY, as Borrower, and IRWIN, as Lender, entered into a Note and Mortgage in the amount of $340,000.00 (the "First Kulchitskiy Note") for the property known as 1010 N. Western Ave., Chicago, IL 60622.  See Exhibit 6 attached hereto.

38.    Also on April 27, 2006, KULCHITSKIY, as Borrower, and IRWIN, as Lender, entered into a Note and Mortgage in the amount of $85,000.00 (the "Second Kulchitskiy Note") for the property known as 1010 N. Western Ave., Chicago, IL 60622.  See Exhibit 7 attached hereto.

39.    KULCHITSKIY defaulted on the First and Second Kulchitskiy Notes (collectively, the "Kulchitskiy Notes").

40.    IRWIN assigned the Kulchitskiy Notes to another bank.  IRWIN's assignee has demanded that it re-purchase the Kulchitskiy Notes.

6

41.    Pursuant to the Agreement, IRWIN demanded that TERRA repurchase the Kulchitskiy Notes.

42.    TERRA failed to repurchase the Kulchitskiy Notes.

## COUNT I
## BREACH OF CONTRACT AGAINST SVENTEK

43.    IRWIN re-alleges and restates Paragraphs 1 through 42 of its Complaint as though fully set forth herein.

44.    The Second Note is a valid and enforceable contract between IRWIN, as Lender, and SVENTEK as Borrower, for the principle sum of $300,000.00.

45.    SVENTEK defaulted under the Second Note by failing to make payment when due.

46.    The balance due under the Second Note is $299,883.83, plus attorneys' fees, interest, and costs.

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against SVENTEK in the amount of $299,883.83, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

## COUNT II
## BREACH OF CONTRACT AGAINST KULCHITSKIY

47.    IRWIN re-alleges and restates Paragraphs 1 through 46 of its Complaint as though fully set forth herein.

48.    The Kulchitskiy Notes are valid and enforceable contracts between IRWIN, as Lender, and KULCHITSKIY as Borrower, for the principle sum of $425,000.00.

49.    KULCHITSKIY defaulted under the Notes by failing to make payments when due.

50.    The balance due under the Kulchitskiy Notes is $95,897.87, plus attorneys' fees,

interest, and costs.

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against KULCHITSKIY in the amount of $95,897.87, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

## COUNT III
## BREACH OF CONTRACT AGAINST TERRA

51.    IRWIN re-alleges and restates Paragraphs 1 through 50 of its Complaint as though fully set forth herein.

52.    The Agreement is a valid and enforceable between IRWIN and TERRA.

53.    TERRA breached the Agreement as to the Second Note by failing to disclose that KAPLAN represented the Seller, and in that SVENTEK's representations about her income and/or marital status were false.  See, Agreement paragraphs 8B, 13.  TERRA breached te Agreement with respect to the Kulchitskiy Notes in that KULCHITSKIY lied about his income, in which case TERRA is required to repurchase the Kulchitskiy Notes.

54.    TERRA is also in default under the Agreement by failing to repurchase the Second Note and the Kulchitskiy Notes.

55.    IRWIN has been damaged in the amount of $395,781.70, plus attorneys' fees, interest and costs.

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against TERRA in the amount of $395,781.70, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

8

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
**AGAINST TERRA AND KAPLAN**

56.      IRWIN re-alleges and restates Paragraphs 1 through 55 of its Complaint as though fully set forth herein.

57.      TERRA and KAPLAN knew when SVENTEK's loan applications were submitted to IRWIN that TERRA was breaching TERRA'S representations and warranties to IRWIN in that TERRA warranted that the only consideration it was receiving on the transaction was from the Borrower with respect to fees incurred for brokering the loans, even though KAPLAN also represented the Seller.

58.      TERRA and KAPLAN knew that IRWIN would have rejected the loan applications had IRWIN known that TERRA's employee, KAPLAN, also represented the Seller, as her attorney.

59.      TERRA and KAPLAN intended to conceal TERRA and KAPLAN's knowledge of KAPLAN's representation of the Seller to induce IRWIN to fund the Notes.

60.      TERRA and KAPLAN's concealment of KAPLAN's representation was material to IRWIN, because had it known of the misrepresentation it would not have funded the SVENTEK Notes.

61.      IRWIN could not have discovered TERRA and KAPLAN's misrepresentation because neither TERRA nor KAPLAN disclosed it, and in fact TERRA and KAPLAN affirmatively represented that no such conflict existed.

62.      TERRA and KAPLAN's misrepresentation caused IRWIN injury by causing IRWIN to fund the Notes, when it otherwise would not have, damaging IRWIN in the amount of $299,883.83, plus punitive damages, as well as attorneys' fees and costs.

9

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against TERRA and KAPLAN, jointly and severally, in the amount of $299,883.83, plus punitive damages, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

## COUNT V
## FRAUD AGAINST SVENTEK

63.　　IRWIN re-alleges and restates Paragraphs 1 through 62 of its Complaint as though fully set forth herein.

64.　　SVENTEK knew that the representations she made in Paragraphs 23-26 were false when she made them.

65.　　SVENTEK made the representations with the intention that IRWIN rely upon them to approve her for the loans reflected in the First and Second Notes.

66.　　IRWIN in fact relied on SVENTEK's misrepresentations in agreeing to fund the purchase of the Property.

67.　　IRWIN has been damaged by SVENTEK's fraud in the amount of the Second Note, plus attorneys' fees, interest and costs.

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against SVENTEK in the amount of $299,883.83, plus punitive damages, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

## COUNT VI
## CIVIL CONSPIRACY AGAINST SVENTEK AND KYSELYTSYA

68.　　IRWIN re-alleges and restates Paragraphs 1 through 67 of its Complaint as though fully set forth herein.

69.     Upon information and belief, prior to August 9, 2006, SVENTEK and KYSELYTSYA agreed to orchestrate a real estate flipping scheme by agreeing to buy nearly simultaneously nine pieces of real property by taking advantage of the "gap period" and by misrepresenting their marital status and income, so as to buy as many properties as possible.

70.     The conspiracy depended upon SVENTEK and KYSELYTSYA concealing their marital status and income; otherwise, SVENTEK's loans would be traced to KYSELYTSYA, in which case the scheme would not have succeeded.

71.     SVENTEK and KYSELYTSYA intended to defraud lenders such as IRWIN, because neither SVENTEK nor KYSELYTSYA intended to reside in the properties or to make the payments due under the Notes related to the mortgages.

72.     IRWIN was damaged by the conspiracy, because had it known of the facts that SVENTEK and KYSELYTSYA concealed as well as their intention to defraud other lenders, IRWIN would not have made the loans reflected in the First and Second Notes.  The undersecured portion of SVENTEK's debt is $299,883.83, plus attorney's fees and costs.

WHEREFORE, IRWIN respectfully requests that the Court enter judgment in its favor and against SVENTEK and KYSELYTSYA, jointly and severally, in the amount of $299,883.83, plus punitive damages, plus attorneys' fees, interest and costs, as well as all other and relief which this Court deems just.

IRWIN MORTGAGE CORPORATION,

By:     s/ Alex Darcy
        Alex Darcy, Esq. (ARDC# 06220515)
        ASKOUNIS & DARCY, PC
        333 N. Michigan Ave.
        Suite 510

11

Chicago, IL 60601
312/784-2400
312/784-2410 (Facsimile)
adarcy@askounisdarcy.com

U:\BJohnson\Irwin Mortgage\Terra Financial\Complaint.wpd

08 CV 3032
JUDGE SHADUR
MAGISTRATE JUDGE COLE

# IRWIN MORTGAGE CORPORATION
## LOAN BROKER AGREEMENT

This Loan Broker Agreement ("Agreement"), made and entered into this *25th* day of *JANUARY*, 20 *06*, by and between IRWIN MORTGAGE CORPORATION, an Indiana corporation ("Irwin") and *TERRA FINANCIAL CONSULTING CORP.* ("Broker").

Whereas, Broker is in the business of originating first mortgage real estate loans by taking and processing loan applications from prospective borrowers and placing these applications on a non-exclusive basis with mortgage lenders such as Irwin who underwrite, close and fund approved loans; and

Whereas, Irwin and Broker desire to engage in similar transactions for such loans ("Loans").

Now therefore, in consideration of the mutual promises made herein and the terms and conditions set forth below, Irwin and Broker agree as follows:

## PROCEDURES

1. **Registering Loans.** Broker may from time to time register Loans with Irwin. The price for any such Loans, the lock-in period, and all other price issues will be governed by Irwin's Pricing Policy and Procedures (the "Pricing Policy"), a copy of which is attached as Exhibit "A". By locking-in a Loan, Irwin agrees to fund the Loan, provided that the Loan complies with all provisions of this Agreement and the Irwin Pricing Policy and closes with Irwin. Irwin in its sole discretion, reserves the right to change prices and its Pricing Policy at any time and without prior notice to Broker. In no event, however, shall such a change in prices or the Pricing Policy affect a Loan previously locked-in with Irwin by Broker.

2. **Status of Registered Loans.** Broker will keep Irwin informed as to the pipeline status of Loans to be funded by Irwin under this Agreement.

3. **Broker Duties.** Broker understands and agrees that payment of any compensation shall be based solely on actual and specific loan origination and processing services provided by Broker in connection with each Loan transaction. These services shall include, but are not limited to, the following: (a) counseling borrowers concerning availability of various loans and the general process of obtaining a loan; (b) explaining to borrowers Irwin's loan products, programs and lending philosophy; (c) completing the loan application with borrowers and obtaining signatures thereto; (d) obtaining merged credit reports including FICO scores from three repositories; (e) evaluating such credit information to pre-qualify borrowers for Irwin's loan products and programs; (f) assisting borrowers with explanations of delinquent credit; (g) preparing Good Faith Estimates as required by the Real Estate Settlement Procedures Act and preliminary Truth in Lending Act disclosures and sending same to borrowers within three (3) business days of application; (h) providing borrowers with all other disclosures required by federal, state or local laws or regulations; (i) obtaining loan processing information such as verifications of employment and deposits, tax filings and pay stubs; (j) processing information to further qualify borrowers for an Irwin loan products or programs; (k) ordering property appraisals and reviewing same to ascertain conditions; (l) ordering title reports and commitments; (m) keeping borrowers informed of status of loan application; and (n) submitting fully processed application files to Irwin for underwriting.

4. **Delivery of Loan Files.** Irwin will work directly with title companies, closing agents and attorneys to ensure delivery to Irwin of loan documents for Loans closed under this Agreement. However, where Irwin agrees to allow Broker to prepare its own closing documents, Broker will deliver all closing documents to Irwin within three (3) days of loan closing.

**EXHIBIT**

tabbies®

|

5.    **Delivery of Other Information/Documentation**.  All information and documentation on any Loan required by Irwin to satisfy the requirements of FHA, VA, GNMA, FNMA, FHLMC or any private investor or pool commitment shall be delivered by Broker to Irwin no later than thirty (30) calendar days after Loan closing. Broker understands that the timely receipt of such information and documentation is of critical importance to Irwin, and agrees to cooperate to the best of its ability in obtaining and delivering all necessary items to Irwin within the required thirty (30) days.  Any failure by Broker to comply with this provision could result in the required repurchase of the affected Loan or Loans from Irwin and/or the termination of this Agreement by Irwin.

6.    **Underwriting**.  Broker agrees to pay an underwriting fee as established in writing by Irwin from time to time for all Loans Irwin underwrites.  The underwriting of a Loan by Irwin shall not affect in any way Broker's obligations hereunder, including without limitation, Broker's repurchase obligations and or indemnification obligations under this Agreement.

7.    **Irwin Liability to Broker for Registering/Underwriting Loans**.  Notwithstanding any language in this Agreement to the contrary, Irwin shall have no liability to the Broker for any act or omission related to the registration and/or underwriting of Loans, including but not limited to those caused by equipment or computer failures, labor strikes or walkouts, casualty, and acts of God, except where such act or omission constitutes gross negligence on the part of Irwin.

## BROKER REPRESENTATIONS AND WARRANTIES

8.    **Broker Representations and Warranties**.  Broker hereby makes the following representations and warranties to Irwin, which shall be deemed made as of the date hereof, and hereafter as to each and every date Broker submits a Loan to Irwin.

A.  As to Broker:
   1..    Broker is duly organized, validly existing and in good standing under the laws of its state of organization and is qualified to transact business, has all licenses, permits and registrations and is in good standing in each state where Broker originates Loans, as necessary to engage in the mortgage Broker business and to perform as set forth in this Agreement;
   2.    Broker has the full power and authority to enter into this Agreement and neither the execution and delivery of this Agreement or the consummation of the transactions contemplated herein, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict or result in a breach of any term, condition or provision of Broker's certificate of incorporation or by-laws or any agreement to which Broker is a party or by which Broker is bound, or constitute a material default or result in an acceleration under any of the foregoing;
   3.    No consent, approval, authorization or order of any court, governmental body or any other person or entity is required for the execution, delivery and performance by Broker of this Agreement including, but not limited to, the submission of Loans to Irwin;
   4.    Neither Broker nor its agents know of any suit, action, arbitration or legal or administrative or other proceeding pending or threatened against Broker which would affect its ability to perform its obligations under this Agreement; and
   5.    This Agreement has been duly authorized and executed by Broker and is, or upon delivery will be, a legal, valid and binding obligation of Broker enforceable in accordance with its terms, subject only to applicable bankruptcy, reorganization, insolvency, moratorium or other similar laws affecting creditor rights generally.
B.  As to each Loan:
   1.    Each first lien Loan is a valid first lien on the mortgaged property free and clear of all encumbrances and liens having priority over the lien of such Loan, except liens for real estate taxes and special assessments not yet due and payable, and each second lien loan is a valid second lien on the mortgaged property free and clear of all liens having priority over the lien of such loan, except the valid first lien mortgage and liens for real estate taxes and special assessments not yet due and payable ;
   2.    The mortgaged property is free and clear of all mechanic's and materialmen's liens or liens in the nature thereof, and no rights are outstanding that under law could give rise to any such lien, nor is Broker aware of any facts which could give rise to any such lien;

3.    Broker shall deliver to Irwin an appraisal report , or acceptable alternative (e.g. Property Inspection Waiver), of the mortgaged property for each such Loan signed by an appraiser approved or acceptable to Irwin, which report shall be on the applicable FNMA form for the type of property securing the Loan, prior to Irwin's approval of such Loan.  In the case of insured or guaranteed Loans, Broker shall deliver to Irwin a certification, or a copy thereof, by the insuring or guaranteeing agency of its acceptance of the valuation assigned to the real estate security by the appraiser;

4.    All federal and state laws, rules and regulations and all agency (such as Fannie Mae, Freddie Mac, FHA, VA) or institutional investor rules and regulations applicable to the Loans have been complied with, including but not limited to:  The Real Estate Settlement Procedures Act; the Flood Disaster Protection Act; the Federal Consumer Credit Protection Act including the Truth-in-Lending and Equal Credit Opportunity Acts; the Home Mortgage Disclosure Act; the Fair Housing Act; the Gramm-Leach-Bliley Act; statutes or regulations governing fraud, lack of consideration, unconscionability, consumer credit transactions or interest charges; limitations on fees, costs and/or pricing; and all conditions within the control of Broker as to the validity of the insurance or guaranty as required by the National Housing Act of 1934, and the rules and regulations thereunder; or as required by the Servicemen's Readjustment Act of 1944, and the rules and regulations thereunder; or as imposed by the mortgage insurance companies or other insurers;

5.    No Loan is the subject of litigation which could affect Broker's ability to enforce the terms of the obligation or its rights under the Loan documents;

6.    There is in force for each Loan a paid-up title insurance policy issued by an Irwin-approved title company in the amount at least equal to the outstanding principal balance of the Loan;

7.    There is in force for each Loan all hazard and flood insurance policies, where applicable, meeting the requirements of Irwin.

8.    Where required by applicable state law, Broker will record the mortgage assignment in the name of "Mortgage Electronic Registration System as nominee for Irwin Mortgage Corporation" and the assignment of the Loan from Broker to Irwin is valid and enforceable;

9.    The borrower has no rights of rescission, set-offs, counterclaims or defenses to the note or mortgage securing the note arising from the acts and/or omissions of Broker in the origination of the Loan;

10.   Broker has no knowledge that any improvement located on or being part of the mortgaged property is in violation of any applicable zoning law or regulation;

11.   The mortgage property is (a)  in good repair and free of substantial damage from any cause, including but not limited to termites, flood, fire, accident, earthquake, hurricane, or other disaster or calamity; and (b) the market for real estate in the geographical area of the mortgage property has not materially and adversely declined since the date the property appraisal report was issued; and

12.   Neither Broker, borrower or any person or entity engaged by Broker, its officers, employee's or agents which is involved in the Loan, including without limitation any appraiser or credit reporting agency, has (a) made any false representation or provided information which is not true, complete and accurate as is reasonably necessary for Irwin to make an underwriting decision; or (b) received any direct or indirect benefit, fee, commission or other consideration of value from borrower or any other party in connection with the Loan except those fees properly charged to borrower.

13.   The Loan meets all requirements of the Product Guide.

## BROKER'S REPURCHASE AND INDEMNITY OBLIGATIONS

9.    <u>Broker's Repurchase Obligations</u>.  Broker shall repurchase any Loan sold to Irwin pursuant to this Agreement within thirty (30)  business days of receipt of written notice from Irwin of any of the following circumstances:

A.   Broker fraud or misrepresentation in the origination, processing or closing of the Loan;
B.   Broker fails to observe or perform or breaches in any material respect any of the representations, warranties, covenants or agreements contained in this Agreement or the Manual with respect to a particular Loan;
C.   Failure by Broker to deliver to Irwin within thirty (30) days from the date each Loan was purchased by Irwin the original information/documentation specified in Section 5 hereof; or
D.   When Irwin is required to repurchase a loan from a secondary market investor arising from Broker's breach or failure to perform under this Agreement.

The option to request or accept repurchase of any Loan is at the sole discretion of Irwin, and shall survive termination of this Agreement.

10.    **Repurchase Price**.  Repurchases under Section 9 hereof shall be priced as the sum of:

A.    The unpaid principal balance of the Loan on the date of repurchase;
B.    All accrued and unpaid interest on the Loan as of the date of repurchase;
C.    All unreimbursed advances and extraordinary costs and expenses incurred by Irwin with regard to the Loan;
D.    Any yield spread premium, service release fee or other amounts previously paid by Irwin to Broker for the Loan; and
E.    All losses, costs, damages and expenses incurred by Irwin in connection with such repurchase.

Upon any such repurchase of Loans by Broker, Irwin shall endorse the promissory note and assign any security interest, both without recourse, to Broker.

11.    **Broker Indemnification of Irwin**.  In addition to Broker's repurchase obligations under Section 9, Broker will indemnify, defend and hold Irwin harmless from and against any loss, damage, cost or expense, including but not limited to, reasonable attorney's fees and expenses (a) arising out of any default by Broker, (b) arising out of any act or omission of Broker or any employee or agent of Broker; (c) arising out of Broker's failure to perform any of its obligations hereunder; or (d) arising out of or in connection with falsity, incorrectness, incompleteness or breach in any material respect of any representation or warranty made by Broker herein.


## OTHER PROVISIONS

12.    **Prepayment Refund**.  For each loan which is paid in full by the borrower for any reason during the one hundred and twenty (120) day period ("Recapture Period") commencing on the later to occur of (i) the funding of the loan or (ii) the assignment and delivery of the loan to Irwin, except for a loan paid in full by a refinance by Irwin (excluding any Loan refinanced by Broker), Irwin reserves the right to require Broker to refund to Irwin all fees paid to Broker in connection with the origination of such loan, including but not limited to, any yield spread premium, service release fee or other amounts previously paid by Irwin to Broker for the Loan.  Broker shall also pay to Irwin all losses, costs, damages and expenses, including attorney fees incurred by Irwin in connection with such prepayment.  Broker covenants, represents and warrants that it shall remit the amount of such Prepayment Refund within ten days of demand.  Broker's failure to return such fees as required hereunder shall be deemed a default and Irwin may charge any such amount due from Broker against compensation due, but not yet paid to Broker.

13.    **Loan Fraud and/or Misrepresentation**.  The submission of a loan application to Irwin containing false or misrepresented information is a federal crime and Irwin cooperates with government agencies and law enforcement officials to pursue parties who provide false information or participate in fraudulent activity.  The following are examples of activities which could lead to such actions being taken against Broker: (a) submission of inaccurate information, including false statements on loan applications and falsification of documents purporting to substantiate credit, employment, deposit balances, ownership of real property and other asset information, or false personal information concerning the borrower; (b) forgery of documents; (c) inaccurate representations of current occupancy or intent to maintain required occupancy as agreed in the application and Loan closing documents; (d) lack of due diligence or appropriate concern by Broker and its employees in obtaining and ascertaining the authenticity of all documents submitted to Irwin; and (e) acceptance of information or documentation which is known or suspected to be inaccurate, including but not limited to the concurrent processing of multiple owner-occupied Loan applications from a single applicant, or permitting an applicant or other interested party to assist in the processing of a Loan application.

14.    **Price Discrimination**. Irwin is committed to the principles of fair lending. Broker acknowledges that Irwin cannot control or police the prices that Broker charges its borrowers. Broker agrees that loan fees, discount points and interest rates must be charged to all borrowers on a non-discriminatory basis without consideration of disability, familial status, color, religion, marital status, receipt of income from public assistance programs or the good faith exercise of any rights under the Consumer Credit Protection Act. Broker agrees to indemnify and hold Irwin harmless from and against any discriminatory practices employed by Broker or its employees and agents.

15.    **No Solicitation**. Loans sold to Irwin cannot be solicited by Broker for prepayment, refinance or any other related products or services. For purposes of this Agreement, "solicit" shall not be deemed to include mass advertising via television, radio, newspapers and similar forms of communication not individually directed to specific Loan borrowers. Broker shall use its best efforts to prevent employees and the employees of affiliated entities from engaging directly or indirectly in any prohibited solicitations under this Agreement.

16.    **Additional Assurances; Inspection**. Broker agrees, from time to time, upon Irwin's request, to provide Irwin with additional evidence that Broker's representations and warranties contained herein are true and correct. This may include allowing Irwin to conduct periodic on-site audits of Broker's business activities related to the Agreement, including but not limited to all books, records and files of Broker pertaining or relating to any Loans registered with Irwin. In addition, Broker will submit to Irwin its annual financial statement, certified by an independent public accountant, within ninety (90) days following the end of each fiscal year.

17.    **Loans Originated by Third Parties**. Irwin shall have no obligation under this Agreement to accept any Loans from Broker which were originated by any entity or person other than Broker, and Broker shall not register any Loans with Irwin that are not originated by employees of Broker.

18.    **Continued Employment of Broker's Principals**. In the event that the Principal or Principals of Broker who negotiate this Agreement with Irwin discontinue their employment with Broker, Broker shall deliver immediate notice of such event to Irwin.

19.    **Notices**. Any notice or demand which is required or permitted to be given by any provision of the Agreement shall be deemed to have been sufficiently given if either served personally or sent by prepaid, registered or certified mail, addressed to the party at its address set forth below:

Irwin Mortgage Corporation          Broker: *TERRA FINANCIAL CONSULTING*
PO Box 6107                         *4043 DEMPSTER ST*
Indianapolis, IN 46206-6107        *SKOKIE, IL 60076*
Attention: Mr. Les Acree           Attention: *ALEXEY Y. KAPLAN*

Either party may change its address by notice to the other.

20.    **Termination**. This Agreement may be terminated by either Irwin or Broker without cause upon written notice addressed to the other party as provided in Section 19 above. In event of such termination, Irwin agrees to close after termination those Loans locked-in by the Broker prior to the date of termination. However, in the event that Irwin, in its sole judgment and discretion, reasonably determines that there has been fraud or misrepresentation concerning Loans registered by Broker, or any other material breach by Broker of this Agreement, Irwin reserves the right to cancel this Agreement immediately and without prior notice, and to refuse to close any Loans registered by the Broker prior to such termination. All other rights and obligations of the parties hereto which arose prior to termination shall survive termination.

21.    **Irwin Product Guide**. All provisions of the Irwin Wholesale Product Guide (the "Product Guide") are incorporated by reference into this Agreement and shall be binding upon Broker. However, by its terms, the Product Guide may be amended or supplemented by Irwin from time to time, as is reasonably necessary to improve the operation and efficiency thereof. Any changes to the Product Guide will be binding upon Broker when made and without notice thereof. The Product Guide may be accessed at www.irwinconnect.com.

22.    **Relationship of the Parties**. By virtue of this Agreement, it is agreed that Irwin and Broker shall not be considered to be partners or joint venturers, and that Broker is not to act as the agent of Irwin in origination, processing or performance of any other obligation, and shall act in all matters hereunder as an independent contractor.

23.    **Miscellaneous**. No assignment, transfer or other alienation of this Agreement by Broker shall be effective without the prior written consent of Irwin. This Agreement is established for the sole benefit of Irwin and Broker, and no party other than Irwin and Broker shall be entitled to the benefit thereof. No waiver by Irwin of any term or condition hereof shall impair any right of Irwin or be construed as a waiver of any term or condition in the future. There are no promises or inducements by Irwin to Broker not contained herein, and this Agreement cannot be amended or modified orally, and no provision of this Agreement may be waived or amended except in writing executed by Irwin and Broker. Such a written waiver or amendment must expressly reference this Agreement. All of the covenants, agreements, representations and warranties made herein by the parties hereto shall suffice and continue in effect after the termination of the Agreement or the consummation of the transactions contemplated hereby. This Agreement supersedes any and all prior written or oral agreements between Broker and Irwin as to the subject matter of this Agreement. This Agreement may be executed in counterparts, all of which taken together shall constitute one and the same instrument. This Agreement has been entered into and shall be governed and construed in accordance with the laws of the State of Indiana.

IN WITNESS WHEREOF, the undersigned parties have executed this Agreement as of the date herein above written:

IRWIN MORTGAGE CORPORATION

By: _____
Les Acree, Senior Vice President

BROKER

By: _____

Printed Name: ALEXEY Y. KAPLAN

Its: OWNER

Revised 12/22/05

MULTI-BOARD RESIDENTIAL REAL ESTATE CONTRACT 3.0

1. **THE PARTIES:** Buyer and Seller are hereinafter referred to as the "Parties".

Buyer(s) _Halyna Svenlek_ Seller(s) _QCR_
    (Please Print)                              (Please Print)

2. **THE REAL ESTATE:** Real Estate shall be defined to include the Real Estate and all improvements thereon. Seller agrees to convey to Buyer or to Buyer's designated grantee, the Real Estate with the approximate lot size or acreage of _____ commonly known as: _5842 Main St, Morton Grove_
_____ Address          City        State   Zip
_Cook_
County _____ Unit # (if applicable) _____ Permanent Index Number(s) of Real Estate _____
Condo/Coop/Townhome Parking Space Included: (check type) ___ deeded space; ___ limited common element;
assigned; Parking space # _____ (insert number)

3. **FIXTURES AND PERSONAL PROPERTY:** All of the fixtures and personal property stated herein are owned by Seller and to Seller's knowledge are in operating condition on the Date of Acceptance, unless otherwise stated herein. Seller agrees to transfer to Buyer all fixtures, all heating, electrical, plumbing and well systems together with the following items of personal property by Bill of Sale at Closing: [Check or enumerate applicable items]

| | | |
|---|---|---|
| ___ Refrigerator | ___ All Tacked Down Carpeting | ___ Fireplace Screen(s)/Door(s)/Grate(s) | ___ Central Air Conditioning |
| ___ Oven/Range/Stove | ___ All Window Treatments & Hardware | ___ Fireplace Gas Logs | ___ Electronic or Media Air Filter |
| ___ Microwave | ___ Built-in or Attached Shelving | ___ Existing Storms & Screens | ___ Central Humidifier |
| ___ Dishwasher | ___ Smoke Detector(s) | ___ Security System(s) (owned) | ___ Sump Pump(s) |
| ___ Garbage Disposal | ___ Ceiling Fan(s) | ___ Intercom System | ___ Water Softener (owned) |
| ___ Trash Compactor | ___ TV Antenna System | ___ Central Vac & Equipment | ___ Outdoor Shed |
| ___ Washer | ___ Window Air Conditioner(s) | ___ Electronic Garage Door Opener(s) | ___ Attached Gas Grill |
| ___ Dryer | ___ All Planted Vegetation | with _____ Transmitter(s) | ___ Light Fixtures, as they exist |
| ___ Satellite Dish and System | | ___ Invisible Fence System, Collar(s) and Box | ___ Home Warranty $ _____ |

Other items included: _____
Items NOT included: _____
Seller warrants to Buyer that all fixtures, systems and personal property included in this Contract shall be in operating condition at possession, except: _____
A system or item shall be deemed to be in operating condition if it performs the function for which it is intended, regardless of age, and does not constitute a threat to health or safety.

4. **PURCHASE PRICE:** Purchase Price of $ _595000_ earnest money of $ _n/a_ by (check), (cash), (or (note due on _____ ) shall be paid as follows: Initial 20___ ) to be increased to a total of $ _____ by _____, 20___. The earnest money and the original of this Contract shall be held by the Listing Company, as "Escrowee", in trust for the mutual benefit of the Parties. The balance of the Purchase Price, as adjusted by prorations, shall be paid at Closing by wire transfer of funds, or by certified, cashier's, mortgage lender's or title company's check (provided that the title company's check is guaranteed by a licensed title insurance company).

5. **MORTGAGE CONTINGENCY:** This Contract is contingent upon Buyer obtaining an unconditional written mortgage commitment (except for matters of title and survey or matters totally within Buyer's control) on or before _Sep 1_ , 20___ for a _conventional_ (type) loan of $ _____ or such lesser amount as Buyer elects to take, plus private mortgage insurance (PMI), if required. The interest rate (initial rate, if applicable) shall not exceed _10_ % per annum, amortized over not less than _30_ years. Buyer shall pay loan origination fee and/or discount points not to exceed _6_ % of the loan amount. Seller shall pay loan origination fee and/or discount points not to exceed _3_ % of the loan amount. Those fees/points committed to by Buyer shall be applied first. Buyer shall pay the cost of application, usual and customary processing fees and Closing costs charged by lender. (If FHA/VA, refer to Paragraph #36 for additional provisions.) Buyer shall make written loan application within five (5) business days after the Date of Acceptance. Failure to do so shall constitute an act of default under this Contract. If Buyer, having applied for the loan specified above, is unable to obtain a loan commitment and serves written notice to Seller within the time specified, this Contract shall be null and void and earnest money refunded to Buyer upon written direction of the Parties to Escrowee. If written notice is not served within the time specified, Buyer shall be deemed to have waived this contingency and this Contract shall remain in full force and effect. Unless otherwise provided herein, this Contract shall not be contingent upon the sale and/or closing of Buyer's existing real estate. A condition in the mortgage commitment requiring sale and/or closing of existing real estate shall not render the mortgage commitment conditional for the purpose of this paragraph. If Seller at Seller's option and expense, within thirty (30) days after Buyer's notice, procures for Buyer such commitment or notifies Buyer that Seller

_C. S._  Buyer Initial _G. S._    Buyer Initial _G. S._    Seller Initial _N.Y_    Seller Initial _N.Y_
Address _5842 Main St, Morton Grove, IL 60053_
Page 1 of 8

EXHIBIT
2
tabbies®

57  will accept a purchase money mortgage upon the same terms, this Contract shall remain in full force and effect.
58  In such event, Seller shall notify Buyer within five (5) business days after Buyer's notice of Seller's election to
59  provide or obtain such financing, and Buyer shall furnish to Seller or lender all requested information and shall
60  sign all papers necessary to obtain the mortgage commitment and to close the loan.
61  **6. CLOSING:** Closing or escrow payout shall be on _____ SEP 8 _____, 20 06, or at such time as
62  mutually agreed upon by the Parties in writing. Closing shall take place at the title company escrow office situated
63  geographically nearest the Real Estate, or as shall be agreed mutually by the Parties.
64  **7. POSSESSION:** Possession shall be deemed to have been delivered when Seller has vacated Real Estate and delivered
65  keys to Real Estate to Buyer or to Listing Office. Seller shall deliver possession to Buyer at the time of Closing.
66  **8. RESIDENTIAL REAL ESTATE AND LEAD-BASED PAINT DISCLOSURES:** If applicable, prior to signing
67  this Contract, Buyer [check one] ☐ has ☐ has not received a completed Illinois Residential Real Property Disclosure
68  Report; [check one] ☐ has ☐ has not received the EPA Pamphlet,"Protect Your Family From Lead in Your Home";
69  [check one] ☐ has ☐ has not received a Lead-Based Paint Disclosure.
70  **9. PRORATIONS:** Proratable items shall include, without limitation, rents and deposits (if any) from tenants, utilities,
71  water and sewer, and homeowner or condominium association fees. Seller represents that as of the Date of Acceptance
72  Homeowner Association/Condominium fees are $ _____ per _____. Seller agrees to pay prior to or
73  at Closing any special assessments (governmental or association) confirmed prior to Date of Acceptance. The general
74  Real Estate taxes shall be prorated as of the date of Closing based on _____ 105 _____ % of the most recent ascertainable full
75  year tax bill. All prorations shall be final as of Closing, except as provided in paragraph17. If the amount of the most
76  recent ascertainable tax bill reflects a homeowner, senior citizen or other exemption, Seller has submitted or will submit
77  in a timely manner all necessary documentation to the Assessor's Office, before or after Closing, to preserve said
78  exemption(s). Accumulated reserves of a Homeowner/Condominium Association are not a proratable item.
79  **10. OTHER PROVISIONS:** This Contract is also subject to those OPTIONAL PROVISIONS selected for use and
80  initialed by the Parties which are contained on the succeeding pages and the following attachments, if any:
81  _____
82  **11. PROFESSIONAL INSPECTIONS:** Buyer may secure at Buyer's expense (unless otherwise provided by
83  governmental regulations) a home, radon, environmental, lead-based paint and/or lead-based paint hazards (unless
84  separately waived), and/or wood insect infestation inspection(s) of said Real Estate by one or more licensed or certified
85  inspection service(s). Buyer shall serve written notice upon Seller or Seller's attorney of any defects disclosed by the
86  inspection(s) which are unacceptable to Buyer, together with a copy of the pertinent page(s) of the report(s) within five
87  (5) business days (ten (10) calendar days for a lead-based paint and/or lead-based paint hazard inspection) after Date of
88  Acceptance. If written notice is not served within the time specified, this provision shall be deemed waived by
89  Parties and this Contract shall remain in full force and effect. If within ten (10) business days after Date of
90  Acceptance, written agreement cannot be reached by the Parties with respect to resolution of inspection issues, then
91  either Party may terminate this Contract by written notice to the other Party and this Contract shall be null and void
92  and earnest money refunded to Buyer upon written direction of the Parties to Escrowee. The home inspection shall
93  cover only major components of the Real Estate, including but not limited to, central heating system(s), central cooling
94  system(s), plumbing and well system, electrical system, roof, walls, windows, ceilings, floors, appliances and
95  foundation. A major component shall be deemed to be in operating condition if it performs the function for which it is
96  intended, regardless of age, and does not constitute a threat to health or safety. Buyer shall indemnify Seller and hold
97  Seller harmless from and against any loss or damage caused by the acts or negligence of Buyer or any person performing
98  any inspection(s). Buyer agrees minor repairs and routine maintenance items are not a part of this contingency.
99  **12. ATTORNEY REVIEW:** The respective attorneys for the Parties may approve, disapprove, or make modifications
100 to this Contract, other than stated Purchase Price, within five (5) business days after the Date of Acceptance.
101 Disapproval or modification of this Contract shall not be based solely upon stated Purchase Price. Any notice of
102 disapproval or proposed modification(s) by any Party shall be in writing. If within ten (10) business days after Date of
103 Acceptance written agreement on proposed modification(s) cannot be reached by the Parties, this Contract shall be
104 null and void and earnest money refunded to Buyer upon written direction of the Parties to Escrowee. If written
105 notice is not served within the time specified, this provision shall be deemed waived by the Parties and this
106 Contract shall remain in full force and effect.
107 **13. PLAT OF SURVEY:** Not less than one (1) business day prior to Closing, except where the subject property is a
108 condominium (see Paragraph 27) Seller shall, at Seller's expense, furnish to Buyer or his attorney a Plat of Survey dated
109 not more than six (6) months prior to the date of Closing, prepared by an Illinois Professional Land Surveyor, showing

_C. S._ Buyer Initial _C. S._ Buyer Initial _N Y_ Seller Initial _N Y_ Seller Initial
Address _5842 Main St. Morton Grove, IL 60053_
Page 2 of 8

110 any encroachments, measurements of all lot lines, all easements of record, building set back lines of record, fences, all
111 buildings and other improvements on the Real Estate and distances therefrom to the nearest two lot lines. In addition, the
112 survey to be provided shall be a boundary survey conforming to the current requirements of the Illinois Department of
113 Professional Regulation. The survey shall show all corners staked and flagged or otherwise monumented. The survey
114 shall have the following statement prominently appearing near the professional land surveyor seal and signature: "This
115 professional service conforms to the current Illinois minimum standards for a boundary survey." A Mortgage Inspection,
116 as defined, is not a boundary survey, and does not satisfy the necessary requirements.
117 **14. NOTICE:** All notices required shall be in writing and shall be served by one Party or his attorney to the other Party
118 or his attorney. Notice to any one of a multiple person Party shall be sufficient notice to all. Notice shall be given in the
119 following manner:

    (a) By personal delivery of such notice; or
121     (b) By mailing of such notice to the addresses recited herein by regular mail and by certified mail, return receipt
122         requested. Except as otherwise provided herein, notice served by certified mail shall be effective on the date of
123         mailing; or
124     (c) By sending facsimile transmission. Notice shall be effective as of date and time of facsimile transmission,
125         provided that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00
126         P.M. Chicago time). In the event fax notice is transmitted during non-business hours, the effective date and time
127         of notice is the first hour of the first business day after transmission; or
128     (d) By sending e-mail transmission. Notice shall be effective as of date and time of e-mail transmission, provided
129         that the notice transmitted shall be sent on business days during business hours (8:00 A.M. to 6:00 P.M. Chicago
130         Time), and provided further that the recipient provides written acknowledgment to the sender of receipt of the
131         transmission (by e-mail, facsimile, or by regular mail). In the event e-mail notice is transmitted during non-
132         business hours, the effective date and time of notice is the first hour of the first business day after transmission.
133 **15. THE DEED:** Seller shall convey or cause to be conveyed to Buyer or Buyer's designated grantee good and
134 merchantable title to the Real Estate by recordable general Warranty Deed, with release of homestead rights, (or the
135 appropriate deed if title is in trust or in an estate), and with real estate transfer stamps to be paid by Seller (unless
136 otherwise designated by local ordinance). Title when conveyed will be good and merchantable, subject only to: general
137 real estate taxes not due and payable at the time of Closing, covenants, conditions, and restrictions of record, building
138 lines and easements, if any, so long as they do not interfere with the current use and enjoyment of the Real Estate.
139 **16. TITLE:** At Seller's expense, Seller will deliver or cause to be delivered to Buyer or Buyer's attorney within
140 customary time limitations and sufficiently in advance of Closing, as evidence of title in Seller or Grantor, a title
141 commitment for an ALTA title insurance policy in the amount of the Purchase Price with extended coverage by a title
142 company licensed to operate in the State of Illinois, issued on or subsequent to the Date of Acceptance of this Contract,
143 subject only to items listed in Paragraph 15. The requirement of providing extended coverage shall not apply if the Real
144 Estate is vacant land. The commitment for title insurance furnished by Seller will be conclusive evidence of good and
145 merchantable title as therein shown, subject only to the exceptions therein stated. If the title commitment discloses
146 unpermitted exceptions, or if the Plat of Survey shows any encroachments which are not acceptable to Buyer, then Seller
147 shall have said exceptions or encroachments removed, or have the title insurer commit to insure against loss or damage
148 that may be caused by such exceptions or encroachments. If Seller fails to have unpermitted exceptions waived or title
149 insured over prior to Closing, Buyer may elect to take the title as it then is, with the right to deduct from the Purchase
150 Price prior encumbrances of a definite or ascertainable amount. Seller shall furnish Buyer at Closing an Affidavit of
151 Title covering the date of Closing, and shall sign any other customary forms required for issuance of an ALTA Insurance
152 Policy.
153 **17. REAL ESTATE PROPERTY TAX ESCROW:** In the event the Real Estate is improved, but has not been
154 previously taxed for the entire year as currently improved, the sum of three (3) percent of the Purchase Price shall be
155 deposited in escrow with the title company with the cost of the escrow to be divided equally by Buyer and Seller and
156 paid at Closing. When the exact amount of the taxes prorated under this Contract can be ascertained, the taxes shall be
157 prorated by the Seller's attorney at the request of either Party, and the Seller's share of such tax liability after reproration
158 shall be paid to the Buyer from the escrow funds and the balance, if any, shall be paid to the Seller. If the Seller's
159 obligation after such reproration exceeds the amount of the escrow funds, Seller agrees to pay such excess promptly
160 upon demand.
161 **18. PERFORMANCE:** Time is of the essence of this Contract. In the event of default by Seller or Buyer, the Parties
162 are free to pursue any legal remedies at law or in equity. The prevailing Party in litigation shall be entitled to collect

_C. S._ Buyer Initial _C. S._ Buyer Initial _N V_ Seller Initial _N V_ Seller Initial

Address _5842 Main St. Morton Grove, IL 60053_

Page 3 of 8

163 reasonable attorney fees and costs from the losing Party as ordered by a court of competent jurisdiction. There shall be
164 no disbursement of earnest money unless Escrowee has been provided written agreement from Seller and Buyer. Absent
165 an agreement relative to the disbursement of earnest money within a reasonable period of time, Escrowee may deposit
166 funds with the Clerk of the Circuit Court by the filing of an action in the nature of interpleader. Escrowee shall be
167 reimbursed from the earnest money for all costs, including reasonable attorney fees, related to the filing of the
168 interpleader action. Seller and Buyer shall indemnify and hold Escrowee harmless from any and all conflicting claims
169 and demands arising under this paragraph.
170 **19. DAMAGE TO REAL ESTATE PRIOR TO CLOSING:** If, prior to delivery of the deed, the Real Estate shall be
171 destroyed or materially damaged by fire or other casualty, or the Real Estate is taken by condemnation, then Buyer shall
172 have the option of terminating this Contract and receiving a refund of earnest money or of accepting the Real Estate as
173 damaged or destroyed, together with the proceeds of any insurance payable as a result of the destruction or damage,
174 which proceeds Seller agrees to assign to Buyer. Seller shall not be obligated to repair or replace damaged
175 improvements. The provisions of the Uniform Vendor and Purchaser Risk Act of the State of Illinois shall be applicable
176 to this Contract, except as modified in this paragraph.
177 **20. SELLER REPRESENTATIONS:** Seller represents that he has not received written notice from any Governmental
178 body or Homeowner Association of (a) zoning, building, fire or health code violations that have not been corrected; (b)
179 any pending rezoning; or (c) a proposed or confirmed special assessment and /or special service area affecting the Real
180 Estate. Seller further represents that Seller has no knowledge of boundary line disputes, easements or claims of easement
181 not shown by the public records, any hazardous waste on the Real Estate or any improvements for which the required
182 permits were not obtained. Seller represents that there have been no improvements to the Real Estate which are not
183 included in full in the determination of the most recent real estate tax assessment, or which are eligible for home
184 improvement tax exemption.
185 **21. CONDITION OF REAL ESTATE AND INSPECTION:** Seller agrees to leave the Real Estate in broom clean
186 condition. All refuse and personal property that is not to be conveyed to Buyer shall be removed from the Real Estate at
187 Seller's expense before possession. Buyer shall have the right to inspect the Real Estate, fixtures and personal property
188 prior to possession to verify that the Real Estate, improvements and included personal property are in substantially the
189 same condition as of the Date of Acceptance of this Contract, normal wear and tear excepted.
190 **22. GOVERNMENTAL COMPLIANCE:** Parties agree to comply with the reporting requirements of the applicable
191 sections of the Internal Revenue Code and the Real Estate Settlement Procedures Act of 1974, as amended.
192 **23. ESCROW CLOSING:** At the election of either Party, not less than five (5) business days prior to the Closing, this
193 sale shall be closed through an escrow with the lending institution or the title company in accordance with the provisions
194 of the usual form of Deed and Money Escrow Agreement, as agreed upon between the Parties, with provisions inserted
195 in the Escrow Agreement as may be required to conform with this Contract. The cost of the escrow shall be paid by the
196 Party requesting the escrow.
197 **24. FLOOD INSURANCE:** Buyer shall obtain flood insurance if required by Buyer's lender.
198 **25. FACSIMILE:** Facsimile signatures shall be sufficient for purposes of executing, negotiating, and finalizing this
199 Contract.
200 **26. BUSINESS DAYS:** Business days are defined as Monday through Friday, excluding Federal holidays.
201 **27. CONDOMINIUMS:** (If applicable) The Parties agree that the terms contained in this paragraph, which may be
202 contrary to other terms of this Contract, shall supersede any conflicting terms.
203   (a)  Title when conveyed shall be good and merchantable, subject to terms, provisions, covenants and conditions of
204       the Declaration of Condominium and all amendments; public and utility easements including any easements
205       established by or implied from the Declaration of Condominium or amendments thereto; party wall rights and
206       agreements; limitations and conditions imposed by the Condominium Property Act; installments due after the
207       date of Closing of general assessments established pursuant to the Declaration of Condominium.
208   (b)  Seller shall be responsible for all regular assessments due and levied prior to Closing and for all special
209       assessments confirmed prior to the Date of Acceptance.
210   (c)  Buyer has, within five (5) business days from the Date of Acceptance of this Contract, the right to demand from
211       Seller items as stipulated by the Illinois Condominium Property Act. The Contract is subject to the condition
212       that Seller be able to procure and provide to Buyer, a release or waiver of any option of first refusal or other pre-
213       emptive rights of purchase created by the Declaration of Condominium within the time established by the
214       Declaration. In the event the Condominium Association requires personal appearance of Buyer and/or additional
215       documentation, Buyer agrees to comply with same.

_C. S._ Buyer Initial _C. S._ Buyer Initial __N Y__ Seller Initial __N Y__ Seller Initial
Address  5842 Main St Morton Grove, IL 60053
Page 4 of 8

216 (d) In the event the documents and information provided by the Seller to the Buyer disclose that the existing
217 improvements are in violation of existing rules, regulations or other restrictions or that the terms and conditions
218 contained within the documents would unreasonably restrict Buyer's use of the premises or would increase the
219 financial considerations which Buyer would have to extend in connection with the owning of the condominium,
220 then Buyer may declare this Contract null and void by giving Seller written notice within five (5) business days
221 after the receipt of the documents and information required by Paragraph 27 (c), listing those deficiencies which
222 are unacceptable to Buyer, and thereupon all earnest money deposited by Buyer shall be returned to Buyer upon
223 written direction of Parties to escrowee. If written notice is not served within the time specified, Buyer shall
224 be deemed to have waived this contingency, and this Contract shall remain in full force and effect.
225 (e) Seller shall not be obligated to provide a condominium survey.
226 (f) Seller shall provide a certificate of insurance showing Buyer (and Buyer's mortgagee) as insured.
227 **28. CHOICE OF LAW/GOOD FAITH:** All terms and provisions of this Contract including, but not limited to, the
228 Attorney Review and Professional Inspection paragraphs, shall be governed by the laws of the State of Illinois and are
229 subject to the covenant of good faith and fair dealing implied in all Illinois contracts.
230

231 **THE FOLLOWING OPTIONAL PROVISIONS APPLY ONLY IF INITIALED BY ALL PARTIES**
232
233 ☐☐☐☐ **29. SALE OF BUYER'S REAL ESTATE:**
234 [initials]
235 (A) REPRESENTATIONS ABOUT BUYER'S REAL ESTATE: Buyer represents to Seller as follows:
236 (1) Buyer owns real estate commonly known as (address): _____
237 (2) Buyer [check one] ☐ has ☐ has not entered into a contract to sell his real estate. If Buyer has entered into a contract to sell
238 his real estate:
239 (a) Buyer's sale contract [check one] ☐ is ☐ is not subject to a mortgage contingency.
240 (b) Buyer's sale contract [check one] ☐ is ☐ is not subject to a real estate sale contingency.
241 (c) Buyer's sale contract [check one] ☐ is ☐ is not subject to a real estate closing contingency.
242 (3) Buyer [check one] ☐ has ☐ has not listed his real estate for sale with a licensed real estate broker and in a local multiple
243 listing service.
244 (4) If Buyer's real estate is not listed for sale with a licensed real estate broker and in a local multiple listing service,
245 Buyer:[check one]
246 (a) ☐ Shall list his real estate for sale with a licensed real estate broker who will place it in a local multiple
247 listing service within five (5) business days after the Date of Acceptance of this Contract.
248 For information only: Broker: _____
249 Broker's Address: _____ Phone: _____
250 (b) ☐ Does not intend to list his real estate for sale.
251 (5) Buyer authorizes Seller or his agent to verify representations contained in Paragraph 29 at any time, and Buyer agrees to
252 cooperate in providing relevant information.
253 (B) CONTINGENCIES BASED UPON SALE AND/OR CLOSE OF BUYER'S REAL ESTATE:
254 (1) This Contract is contingent upon Buyer having a contract for the sale of Buyer's real estate in full force and effect as of
255 _____ 20____. Such contract shall provide for a Closing date not later than the Closing date set forth in
256 this Contract. If written notice of failure to procure such contract is not served within the time specified, Buyer shall
257 be deemed to have waived this contingency and this Contract shall remain in full force and effect. (If this paragraph
258 is used, then the following paragraph must be completed.)
259 (2) In the event the Buyer has procured a contract for the sale of Buyer's real estate as set forth in Paragraph 29 (B) (1) and that
260 contract is in full force and effect or has entered into a contract for sale of Buyer's real estate prior to the execution of this
261 Contract, this Contract is contingent upon Buyer Closing the sale of Buyer's real estate on or before
262 _____ 20____. If written notice is not served within the time specified, Buyer shall be
263 deemed to have waived all contingencies contained in this Paragraph 29, and this Contract shall remain in full force
264 and effect.
265 (3) If the contract for the sale of Buyer's real estate is terminated for any reason after the date set forth in Paragraph 29 (B) (1)
266 (or after the date of this Contract if no date is set forth in Paragraph 29 (B) (1)), Buyer shall, within three (3) business days
267 of such termination, notify Seller of said termination. Unless Buyer, as part of said notice, waives all contingencies in
268 Paragraph 29 and complies with Paragraph 29 (D), this Contract shall be null and void as of the date of notice and earnest
269 money refunded to Buyer upon written direction of the Parties to Escrowee. If written notice as required by this
270 subparagraph is not served within the time specified, Buyer shall be in default under the terms of this Contract.
271 (C) SELLER'S RIGHT TO CONTINUE TO OFFER REAL ESTATE FOR SALE During the time of this contingency Seller
272 has the right to continue to show the Real Estate and offer it for sale subject to the following:

_C. S._ Buyer Initial _C. S._ Buyer Initial _N.Y._ Seller Initial _N.Y._ Seller Initial
Address _5842 Main St. Morton Grove, IL 60053_

273 (1) If Seller accepts another bona fide offer to purchase the Real Estate during such period, Seller shall notify Buyer in writing
274 of same. Buyer shall then have _____ hours after Seller gives such notice to waive the contingencies set forth in
275 Paragraph 29 (B), subject to Paragraph 29 (D).
276 (2) If Buyer complies with the provisions of Paragraph 29 (D) then this Contract shall remain in full force and effect.
277 (3) If the contingencies set forth in Paragraph 29 (B) are NOT waived in writing within said time period by Buyer, this
278 Contract shall be null and void and earnest money refunded to Buyer upon written direction of the Parties to
279 Escrowee.
280 (D) WAIVER OF PARAGRAPH 29 CONTINGENCIES: Buyer shall be deemed to have waived the contingencies in Paragraph
281 29 (B) when Buyer has delivered written waiver and deposited with the Escrowee the additional sum of $_____
282 earnest money within the time specified. If Buyer fails to deposit the additional earnest money within the time specified the
283 waiver shall be deemed ineffective and this Contract shall be null and void and earnest money refunded to Buyer upon
284 written direction of the Parties to Escrowee.
285 (E) NOTICE (FOR THIS CONTINGENCY ONLY): Except as otherwise provided above, notice required under this Paragraph
286 29 shall be in writing and shall be served on the Party. Courtesy copies of notice should be sent to the respective attorneys and real
287 estate agents, if known. Failure to provide such courtesy copies shall not render notice invalid. Notice to any one of a multiple
288 person Party shall be sufficient notice to all. Notice shall be given to the Party in the following manner:
289 (1) By personal delivery of such notice effective at the time and date of personal delivery; or
290 (2) By mailing of such notice to the addresses recited herein by regular mail and by certified mail. Notice served by regular
291 mail and certified mail shall be effective of 10:00 A.M. on the morning of the second day following deposit of notice in the
292 U.S. Mail; or
293 (3) By facsimile to a Party (service shall be effective at the time and date the sending Party receives a receipted copy of the
294 notice from the receiving Party).
295
296 ☐ ☐ ☐ ☐ 30. CANCELLATION OF PRIOR REAL ESTATE CONTRACT: In the event either Party has entered into a prior
297 real estate contract this Contract shall be subject to written cancellation of the prior contract on or before _____
298 20____. In the event the prior contract is not cancelled within the time specified, this Contract shall be null and void and earnest
299 money refunded to Buyer upon written direction of the Parties to Escrowee. Notice to the purchaser under the prior contract
300 should not be served until after Attorney Review and Professional Inspections provisions of this Contract have expired, been
301 satisfied or waived.
302
303 ☐ ☐ ☐ ☐ 31. INTEREST BEARING ACCOUNT: Earnest money (with a completed W9 and other required forms), shall be
304 held in a federally insured interest bearing account at a financial institution designated by Escrowee. All interest earned on the
305 earnest money shall accrue to the benefit of and be paid to Buyer. The Buyer shall be responsible for any administrative fee (not
306 to exceed $75) charged for setting up the account. In anticipation of Closing, the Parties direct Escrowee to close the account no
307 sooner than ten (10) business days prior to the anticipated Closing date.
308
309 ☐ ☐ ☐ ☐ 32. POST-CLOSING POSSESSION: In the event possession is not to be delivered at Closing, the Parties shall enter
310 into a post Closing possession agreement that shall provide, among other things, that possession will be delivered no later than 11:59
311 P.M. on _____ 20____, provided sale has been closed. Seller agrees to pay at Closing the sum of $_____ per day
312 to Buyer for use and occupancy from and including the day after Closing to and including the possession date specified above,
313 regardless of whether possession is delivered prior to the possession date. In the event possession is not delivered at Closing, Seller
314 shall deposit in escrow at Closing with Title Company, Listing Company or other escrowee as agreed to by the Parties and escrowee
315 by separate check, the sum of one percent (1%) of the Purchase Price to guarantee that possession of the Real Estate shall be
316 delivered to Buyer on or before the date and time specified in this Contract. If possession is so delivered, the escrow fund shall be
317 paid to Seller. If possession is not delivered, the designated escrowee shall pay to Buyer from the escrow funds the sum of 1/5th
318 of the deposit for each day possession is withheld from Buyer after such specified date and time, and shall pay the balance of the
319 escrow fund, if any, to Seller. In the event that possession is not delivered to Buyer within five (5) calendar days after the date
320 specified herein, Seller shall continue to be liable to Buyer for a sum of money equal to 1/5th of he possession escrow sum specified
321 herein for each day possession is so withheld from Buyer, without prejudice to any other rights or remedies available to Buyer. If
322 within ten (10) business days after Date of Acceptance written agreement on a post Closing possession agreement cannot be reached
323 by the Parties, this Contract shall be null and void and earnest money refunded to Buyer upon written direction of the Parties
324 to Escrowee. If written notice is not served within the time specified, this provision shall be deemed waived by the Parties
325 and this Contract shall remain in full force and effect.
326
327 ☐ ☐ ☐ ☐ 33. WELL AND/OR SEPTIC/SANITARY INSPECTIONS: Seller shall obtain, at Seller's expense, a well water
328 test (including nitrates test) and/or a septic/sanitary report from the applicable governmental authority or qualified inspection
329 service, each dated not more than ninety (90) days prior to Closing, stating that the well and the water supplied therefrom and the
330 septic/sanitary system are in compliance with applicable health regulations. Seller shall deliver a copy of the report to Buyer not less
331 than fourteen (14) days prior to Closing. If either system is found not to be in compliance with applicable health regulations, and in

*C. S.* _____ Buyer Initial *C. S.* _____ Buyer Initial ____ IUY ____ Seller Initial ____ IUY ____ Seller Initial
Address *5892 Main St, morton Grove; IL. 6005‾3*

332  the event that within five (5) business days after receipt of such report(s), written agreement cannot be reached by the Parties with
333  respect to the resolution of well and/or septic/sanitary issues, then either Party may terminate this Contract by written notice to the
334  other Party and this Contract shall be null and void and earnest money refunded to Buyer upon written direction of the
335  Parties to Escrowee.
336
337  ☐ ☐ ☐ ☐  34. CONFIRMATION OF DUAL AGENCY:  The Parties confirm that they have previously consented to
338  _____ (Licensee) acting as a Dual Agent in providing brokerage services
339  on their behalf and specifically consent to Licensee acting as a Dual Agent with regard to the transaction referred to in this Contract.
340
341  ☐ ☐ ☐ ☐  35. "AS IS" CONDITION:  This Contract is for the sale and purchase of the Real Estate and personal property in its
342  "As Is" condition as of the Date of Offer. Buyer acknowledges that no representations, warranties or guarantees with respect to the
343  condition of the Real Estate and personal property have been made by Seller or Seller's Agent other than those known defects, if
344  any, disclosed by Seller. Buyer may conduct an inspection at Buyer's expense. In that event, Seller shall make the property available
345  to Buyer's inspector at reasonable times. Buyer shall indemnify Seller and hold Seller harmless from and against any loss or damage
346  caused by the acts or negligence of Buyer or any person performing any inspection(s). In the event the inspection reveals that the
347  condition of the improvements, fixtures or personal property to be conveyed or transferred is unacceptable to Buyer and Buyer so
348  notifies Seller within five (5) business days after the Date of Acceptance, this Contract shall be null and void and earnest money
349  shall be refunded to Buyer upon the written direction of the Parties to Escrowee. Failure of Buyer to notify Seller or to conduct
350  said inspection operates as a waiver of Buyer's right to terminate this Contract under this paragraph and this Contract shall remain in
351  full force and effect. Buyer acknowledges the provisions of Paragraph 11 and the warranty provisions of Paragraph 3 do not apply to
352  this Contract.
353
354  ☐ ☐ ☐ ☐  36. VA OR FHA FINANCING:  If Buyer is seeking VA or FHA financing, this provision shall be applicable: Buyer
355  may terminate this Contract if the Purchase Price set forth herein exceeds the appraised value of the Real Estate, as determined by
356  the Veterans Administration (VA) or the Federal Housing Administration (FHA). However, Buyer shall have the option of
357  proceeding with this Contract without regard to the amount of the appraised valuation. If VA, the Funding Fee, or if FHA, the
358  Mortgage Insurance Premium (MIP) shall be paid by Buyer and [check one]  shall  shall not  be added to the mortgage loan
359  amount. Seller agrees to pay additional miscellaneous expenses required by lender not to exceed $200.00.
360  Required FHA or VA amendments shall be attached to this Contract.
361  It is expressly agreed that notwithstanding any other provisions of this Contract, the Buyer shall not be obligated to complete the
362  purchase of the property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless the
363  Buyer has been given, in accordance with HUD/FHA requirements, a written statement by the Federal Housing Commissioner
364  setting forth the appraised value of the property (excluding Closing costs) of not less than $_____.
365  Buyer shall have the privilege and option of proceeding with the consummation of the Contract without regard to the amount of the
366  appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and
367  Urban Development will insure/guarantee. HUD and the mortgagee do not warrant the value nor the condition of the property.
368  Buyer should satisfy himself/herself that the price and condition of the property are acceptable.
369
370  ☐ ☐ ☐ ☐  37. INTERIM FINANCING:  This Contract is contingent upon Buyer obtaining a written commitment for interim
371  financing on or before _____ 20____ in the amount of $_____. If Buyer is unable to secure the
372  interim financing commitment and gives written notice to Seller within the time specified, this Contract shall be null and void and
373  earnest money refunded to Buyer upon written direction of the Parties to Escrowee. If written notice is not served within the
374  time specified, this provision shall be deemed waived by the Parties and this Contract shall remain in full force and effect.
375
376  ☐ ☐ ☐ ☐  38. MISCELLANEOUS PROVISIONS:  Buyer's and Seller's obligations are contingent upon the Parties entering
377  into a separate written agreement consistent with the terms and conditions set forth herein, and with such additional terms as either
378  Party may deem necessary, providing for one or more of the following: (check applicable box(es))
379  ☐ ASSUMPTION OF SELLER'S MORTGAGE
380  ☐ ARTICLES OF AGREEMENT FOR DEED OR PURCHASE MONEY MORTGAGE
381  ☐ VACANT LAND
382  ☐ NEW CONSTRUCTION
383
384  ☐ ☐ ☐ ☐  39. SPECIFIED PARTY APPROVAL:  This Contract is contingent upon the approval of the Real Estate by
385  _____ Buyer's specified party,
386  within five (5) calendar days after the Date of Acceptance. In the event Buyer's specified party does not approve of the Real Estate
387  and written notice is given to Seller within the time specified, this Contract shall be null and void and earnest money refunded
388  to Buyer upon written direction of the Parties to Escrowee. If written notice is not served within the time specified, this
389  provision shall be deemed waived by the Parties and this Contract shall remain in full force and effect.

_C. S._ Buyer Initial _C. S._ Buyer Initial _NY_ Seller Initial _NY_ Seller Initial
Address _5842 Main St. Morton Grove, IL 60053_

Page 7 of 8

390 THIS DOCUMENT WILL BECOME A LEGALLY BINDING CONTRACT WHEN SIGNED BY ALL
391 PARTIES AND DELIVERED
392 The Parties represent that text of this form has not been altered and is identical to the official Multi Board Residential
393 Real Estate Contract 3.0

| | |
|---|---|
| 394 _aug 22_ 20 _06_ | _aug 22_ 20 _06_ |
| 395 Date of Offer | DATE OF ACCEPTANCE |
| 396 | |
| 397 Buyer Signature | Seller Signature |
| 398 | |
| 399 Buyer Signature | Seller Signature _Accept_ |
| 400 _G. Svedek_ | |
| 401 Print Buyer(s) Name(s) | Print Seller(s) Name(s) |
| 402 _Galyna Svedek_ | _NATALYA VATSENKO_ |
| 403 Address | Address |
| 404 | _5842 Main St._ |
| 405 City   State   Zip | City _Morton Grove_ State _IL._ Zip _60053_ |
| 406 | |
| 407 Phone Number(s)   Email | Phone Number(s)   Email |
| 408 FOR INFORMATION ONLY | _847-965-2016_ |
| 409 | |
| 410 Selling Office   MLS # | Listing Office   MLS # |
| 411 | |
| 412 Selling Agent   MLS #   Email | Listing Agent   MLS #   Email |
| 413 | |
| 414 Address,   City,   ST,   Zip | Address,   City,   ST,   Zip |
| 415 | |
| 416 Phone No.   Fax No. | Phone No. _Alex Kaplan_   Fax No. |
| 417 | |
| 418 Buyer's Attorney   Email | Seller's Attorney   Email |
| 419 | |
| 420 Address | Address _847-676-8600  847-676-8691_ |
| 421 | |
| 422 Phone No.   Fax No. | Phone No.   Fax No. |
| 423 _Terra Financial_ 847-6768600 | _Olga Matyuk_ 847-329-1001 |
| 424 Mortgage Company   Fax No. | Loan Officer   Phone No. |
| 425 | |

426 ©2003, Illinois Real Estate Lawyers Association. All rights reserved. Unauthorized duplication or alterations of this
427 form or any portion thereof is prohibited.
428 Official form available at www.reallaw.org (web site of Illinois Real Estate Lawyers Association).
429 Approved by the following organizations January, 2003.
430 Illinois Real Estate Lawyers Association, Belvidere Board of REALTORS®, Boone County Bar Association, Chicago
431 Association of REALTORS®, Du Page County Bar Association, Kane County Bar Association, Lake County Bar
432 Association, McHenry County Association of REALTORS®, North Shore - Barrington Association of REALTORS®,
433 Northwest Association of REALTORS®, Northwest Suburban Bar Association, Oak Park Board of REALTORS®,
434 REALTOR® Association of the Fox Valley, REALTOR® Association of West/South Suburban Chicagoland, West
435 Towns Board of REALTORS®
436
437 This offer was presented to Seller by _____ on ____ 20__ at __:__ AM/Pm
438                    (Agent)                (date)
439 This offer is rejected _____ _____ 20__
440          (Seller initials)      (Seller initials)        (date)

_C. S._ Buyer Initial _C. S._ Buyer Initial _NV_ Seller Initial _NV_ Seller Initial
Address _5842 Main St. Morton Grove, IL 60053_
Page 8 of 8

MIN            1000139-0081077695-9
MERS Telephone: (888) 679-6377

08 CV 3032

JUDGE SHADUR

MAGISTRATE JUDGE COLE

# NOTE

September 15, 2006              Schaumburg                    IL
[Date]                              [City]                    [State]

5842 Main St
Morton Grove, IL 60053
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 595,000.00        (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  Irwin Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        7.250 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the      1st    day of each month beginning on November 1, 2006       . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on October 1, 2036       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 10500 Kincaid Drive, Fishers, IN  46037
or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $   4,058.95       .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

51197225
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    0081077695

VMP®-5N (0207)          Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3          Initials: C.S

EXHIBIT

3

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of        15        calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be        5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

51197225                                                                                                 0081077695

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_C. Sventek_ (Seal)
Galyna Sventek   -Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

_____ (Seal)
-Borrower

*[Sign Original Only]*

51197225                                                    0081077695

MMP-5N (0207)                     Page 3 of 3                     Form 3200 1/01



81077695

**Return To:**
Irwin Mortgage Corporation
Attn: Final Documents
P.O. Box 6107
Indianapolis, IN 46206-6107

Doc#: 0627749083 Fee: $54.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 10/04/2006 12:58 PM Pg: 1 of 16

**Prepared By:**

6004624
2373

——————[Space Above This Line For Recording Data]——————

# MORTGAGE

MIN 1000139-0081077695-9

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated September 15, 2006
together with all Riders to this document.
(B) "Borrower" is Galyna  Sventek, an unmarried woman.



Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

51197226                                                                    0081077695

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3014  1/01

-6A(IL) (0010)
Page 1 of 16                          Initials: C.S.

VMP MORTGAGE FORMS - (800)521-7291

(D) "Lender" is Irwin Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of The State of Indiana
Lender's address is 10500 Kincaid Drive, Fishers, IN  46037

(E) "Note" means the promissory note signed by Borrower and dated September 15, 2006
The Note states that Borrower owes Lender Five Hundred Ninety Five Thousand and
00/100
(U.S. $595,000.00                ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than October 1, 2036
Dollars

(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."

(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider   ☐ Condominium Rider          ☐ Second Home Rider
☐ Balloon Rider           ☐ Planned Unit Development Rider  ☐ 1-4 Family Rider
☐ VA Rider                ☐ Biweekly Payment Rider     ☐ Other(s) [specify]

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

51197226                                                      0081077695

-6A(IL) (0010)          Page 2 of 15          Initials: C.S.          Form 3014  1/01

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
        County                              [Type of Recording Jurisdiction]
of Cook                                      [Name of Recording Jurisdiction]:

ALL OF LOTS 32 AND 33 AND THE EAST 7 FEET OF LOT 34 IN OLIVER SALINGER AND CO.'S SECOND LINCOLN AVENUE SUBDIVISION, A SUBDIVISION OF THAT PART OF THE WEST 1/2 OF THE NORTHEAST 1/4 OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF LINCOLN AVENUE, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOS.

Parcel ID Number: 10-20-229-039-0000              which currently has the address of
5842 Main St                                              [Street]
Morton Grove                       [City], Illinois 60053            [Zip Code]
("Property Address"):

    TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

    THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

    UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

    1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

51197226                                    0081077695

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

51197226                                                    0081077695

-6A(IL) (0010)                    Page 4 of 15        Initials: C. S.        Form 3014   1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

51197226                                                      0081077695

Initials C. S.

-6A(IL) (0010)                  Page 6 of 15                  Form 3014  1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

51197226

0081077695

-6A(IL) (0010)    Page 6 of 16    Form 3014  1/01

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

51197226

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

51197226

0081077695

Initials: _____

Form 3014  1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

51197226                                                                    0081077695

Initials: C. S.

@ -6A(IL) (0010)                        Page 9 of 15                        Form 3014  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

51197226                                                                              0081077695

-6A(IL) (0010)                          Page 10 of 15               Initials: C. S.          Form 3014  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

51197226

Initials: CY S    0081077695

VMP®-6A(IL) (0010)    Page 11 of 16    Form 3014    1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

51197226

-6A(IL) (0010)

Page 12 of 15

Initials: CY J    0081077695

Form 3014    1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

51197226

-6A(IL) (0010)                    Page 13 of 15                    Initials: _____ 0081077695

                                                                    Form 3014   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                 Galyna Sventek                    -Borrower


_____        _____ (Seal)
                                                                   -Borrower


_____ (Seal)  _____ (Seal)
                  -Borrower                                         -Borrower


_____ (Seal)  _____ (Seal)
                  -Borrower                                         -Borrower


_____ (Seal)  _____ (Seal)
                  -Borrower                                         -Borrower


51197226                                    0081077695

-6A(IL) (0010)                Page 14 of 15          Form 3014   1/01

STATE OF ILLINOIS,                                        _Cook_          County ss:

I, _Julie K. Sanfilippo_                    , a Notary Public in and for said county and
state do hereby certify that _Gohydra Cherrier_

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument,
appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said
instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this   _12th_   day of _July_, _2006_

My Commission Expires: _5-12-2010_

_Julie K. Sanfilippo_
Notary Public

```
┌─────────────────────────────────┐
│         OFFICIAL SEAL            │
│      JULIE K. SANFILIPP          │
│  NOTARY PUBLIC, STATE OF ILLINOIS│
│ My Commission Expires May 12, 2010│
└─────────────────────────────────┘
```

51197226

-6A(IL) (0010)                              Page 16 of 16                    Initials: _C.C._   0081077695

Form 3014   1/01

ALL OF LOTS 32 AND 33 AND THE EAST 7 FEET OF LOT 34 IN OLIVER SALINGER AND CO.'S SECOND LINCOLN AVENUE SUBDIVISION, A SUBDIVISION OF THAT PART OF THE WEST ½ OF THE NORTHEAST ¼ OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING SOUTH OF LINCOLN AVENUE, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

MIN          1000139-0081077703-1
MERS Telephone: (888) 679-6377

## NOTE

September 15, 2006                    Schaumburg                         IL
*Date*                                    *City*                           *State*

5842 Main St
Morton Grove, IL 60053
*Property Address*

### 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 300,000.00          (this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is Irwin Mortgage Corporation

, I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

### 2. INTEREST
I will pay interest at a yearly rate of          10.620 %.
Interest will be charged on that part of principal which has not been paid. Interest will be charged beginning on the date of this Note and continuing until the full amount of principal has been paid.

### 3. PAYMENTS
I will pay principal and interest by making payments each month of U.S. $   2,771.17          .
I will make my payments on the          1st          day of each month beginning on November 1 2006          . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on October 1, 2036
I still owe amounts under this Note, I will pay all those amounts, in full, on that date.
I will make my monthly payments at 10500 Kincaid Drive, Fishers, IN  46037
or at a different place if required by the Note Holder.

### 4. BORROWER'S FAILURE TO PAY AS REQUIRED
**(A) Late Charge for Overdue Payments**
If the Note Holder has not received the full amount of any of my monthly payments by the end of          10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be          5.000 % of my overdue payment, but not less than U.S. $ N/A          and not more than U.S. $ N/A          . I will pay this late charge only once on any late payment.
**(B) Notice from Note Holder**
If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.
**(C) Default**
If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.
Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.
**(D) Payment of Note Holder's Costs and Expenses**
If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

### 5. THIS NOTE SECURED BY A MORTGAGE
In addition to the protections given to the Note Holder under this Note, a Mortgage, dated September 15, 2006
, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

51216315                                                          0081077703
**ILLINOIS - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT**                  Form 3914
VMP®-75(IL) (0204)                    Page 1 of 2
                                      VMP MORTGAGE FORMS - (800)521-7291          Initials: *C.S.*



EXHIBIT
4

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS**

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES**

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.

_C. Sventek_ _____ (Seal)      _____ (Seal)
Galyna Sventek                    -Borrower                                   -Borrower

_____ (Seal)      _____ (Seal)
                              -Borrower                                   -Borrower

_____ (Seal)      _____ (Seal)
                              -Borrower                                   -Borrower

_____ (Seal)      _____ (Seal)
                              -Borrower                                   -Borrower

*[Sign Original Only]*

51216315                                                            0081077703

-75(IL) (0204)                        Page 2 of 2                        Form 3914

Return To:
Irwin Mortgage Corporation
Attn: Final Documents
P.O. Box 6107
Indianapolis, IN 46206-6107

THIS IS A TRUE AND
ACCURATE COPY
THE ORIGINAL DOCUMENT

Prepared By:

# MORTGAGE

MIN 1000139-0081077703-1

THIS MORTGAGE is made this 15th        day of September, 2006                    , between the Mortgagor,
Galyna  Sventek, an unmarried woman.

(herein "Borrower"), and the Mortgagee,
Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's
successors and assigns). MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS. Irwin Mortgage Corporation

("Lender") is organized and existing under the laws of The State of Indiana
and has an address of 10500 Kincaid Drive, Fishers, IN  46037

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $300,000.00                    , which
indebtedness is evidenced by Borrower's note dated September 15, 2006                    and extensions and renewals
thereof (herein "Note"), providing for monthly installments of principal and interest, with the balance of indebtedness, if not
sooner paid, due and payable on October 1, 2036                    ;
TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage; and the
performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the
following described property located in the County of Cook
State of Illinois:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

51216316

0081077703

**ILLINOIS** - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT WITH MERS

-76N(IL) (0204)

Page 1 of 8

Form 3814
Amended 2/01
Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

Parcel ID #:10-20-229-039-0000
which has the address of 5842 Main St                                                          [Street],
Morton Grove          [City], Illinois 60053          [ZIP Code] (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Mortgage; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Mortgage.

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

5. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

51216316                                                                                      0081077703

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to

51216316

0081077703

Initials: *C.S.*

this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

   **14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

   **15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

   **16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

   If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

   NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

   **17. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees and costs of documentary evidence, abstracts and title reports.

   **18. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgment enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

   **19. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

   Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

   **20. Release.** Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

   **21. Waiver of Homestead.** Borrower hereby waives all right of homestead exemption in the Property.

51216316

-76N(IL) (0204)                    Page 4 of 5                    Initials: *C. S.*                    0081077703

Form 3814

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

_____ (Seal)
Galyna Sventek                -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

_____ (Seal)
                              -Borrower

(Sign Original Only)

STATE OF ILLINOIS,                                    Cook    County ss:

I, Julie K. Sanfilipp
a Notary Public in and for said county and state do hereby certify that    Galyna Sventek

, personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instruments as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this    15th    day of    September, 2000

My Commission Expires: 5-12-2010

_____
Notary Public

> OFFICIAL SEAL
> JULIE K. SANFILIPP
> NOTARY PUBLIC, STATE OF ILLINOIS
> My Commission Expires May 12, 2010

51216316

0081077703

VMP-76N(IL) (0204)          Page 5 of 5          Form 3814

# EXHIBIT A

File No.: 6004424a
Property Address:  5842 MAIN STREET, MORTON GROVE, IL, 60053

ALL OF LOTS 32 AND 33 AND THE EAST 7 FEET OF LOT 34 IN OLIVER SALINGER AND CO.'S
SECOND LINCOLN AVENUE SUBDIVISION, A SUBDIVISION OF THAT PART OF THE WEST ½ OF THE
NORTHEAST ¼ OF SECTION 20, TOWNSHIP 41 NORTH, RANGE 13 EAST OF THE THIRD PRINCIPAL
MERIDIAN, LYING SOUTH OF LINCOLN AVENUE, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN
COOK COUNTY, ILLINOIS.

PIN: 10-20-229-039

Property Address: 5842 Ma■ St
Morton ■ ve, IL 60053

Loan Number: 0081077703

08 CV 3032

JUDGE SHADUR

MAGISTRATE JUDGE COLE

## LENDER'S CLOSING AFFIDAVIT

To secure a mortgage (Deed of Trust) on the subject property and prior to the release of loan proceeds from the Lender, Irwin Mortgage Corporation_____, I (We) the undersigned, certify the following:

1. I (We) certify that if the subject property is determined to lie within the flood hazard area identified by the Federal Emergency Management Association. I (We) will at all times keep the subject property insured against flood damage at least to the sum of all liens secured by this property or the maximum allowed by the type of property under the National Flood Insurance Program (NFIP).

2. My (Our) employment status, credit standing, assets, and liabilities have remained substantially unchanged from the time my (our) loan application was taken, processed, and approved.

3. I (We) have not arranged or contracted to assume or incur credit obligations that are not reflected on the loan application.

4. I (We) know of no circumstances or events that will materially and adversely affect my (our) financial position.

5. My (Our) marital status has remained the same as stated in the loan application.

6. My (Our) name(s) was (were) spelled correctly and typed exactly the same on all documents.

7. I (We) have signed my (our) name(s) exactly as they were typed and exactly the same in all places requiring signatures.

*C. Sventek*          09.15.06
_____   _____   _____
Galyna Sventek              Date                Date

## IMPORTANT IDENTIFICATION PROCEDURES

Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who obtains a new loan. Therefore, require you, the settlement agent to ask the borrower(s)' name, residential address, date of birth and taxpayer identification number. We require one of the following forms of identification with a picture: U.S. driver's license, passport, or alien registration card. If none of these forms of identification are available, the borrower(s) can provide two of the following forms of ID: Employer identification card, major credit card, or two current utility bills, showing the borrower's current address. (Note identification may not be expired.)

**BORROWER IDENTIFICATION** – Galyna Sventek

Date of Birth: ■■■63        Taxpayer ID # ■■■2745

Primary Identification Type: *Drivers License*    ID # ■■■3621
Date Issued *3/21/06*;  Place Issued *IL*    Expiration Date *1/21/01*

Secondary Identification Type: *Social Security*   ID # ■■■2745
Date Issued *Peterson N/A*  Place Issued *N/A*    Expiration Date *N/A*

**BORROWER IDENTIFICATION** –

Date of Birth: _____   Taxpayer ID # _____

Primary Identification Type: _____   ID # _____
Date Issued _____  Place Issued _____   Expiration Date _____

Secondary Identification Type: _____   ID # _____
Date Issued _____  Place Issued _____   Expiration Date _____

The undersigned has reviewed and completed the identification requirements and certifies the identity of the borrower(s) is accurate.

*Julia Sanfilippo*          9-15-06
_____   _____
Settlement Agent Name              Date

IM-clo-17

51216319              Page 1 of 1

**EXHIBIT**

**5**

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower", as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the "Borrower" (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

*G. Svenlek*

| Borrower | Co-Borrower |
|---|---|

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA  ☐ FHA | ☑ Conventional  ☐ USDA/Rural Housing Service | ☐ Other (explain): | Agency Case Number | Lender Case Number |
|---|---|---|---|---|---|

| Amount | Interest Rate | No. of Months | Amortization Type: | | |
|---|---|---|---|---|---|
| $  595,000 | 7.250 % | 360/360 | ☑ Fixed Rate  ☐ GPM | ☐ Other (explain): ☐ ARM (type): | |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state, & ZIP) | No. of Units |
|---|---|
| 5842  MAIN ST., Morton Grove, IL 60053   County: Cook | 1 |

| Legal Description of Subject Property (attach description if necessary) | Year Built |
|---|---|
| SEE TITLE | 2006 |

| Purpose of Loan | ☑ Purchase  ☐ Construction  ☐ Refinance  ☐ Construction-Permanent | ☐ Other (explain): | Property will be: ☑ Primary Residence  ☐ Secondary Residence  ☐ Investment |
|---|---|---|---|

*Complete this line if construction or construction-permanent loan.*

| Year Lot Acquired | Original Cost | Amount Existing Liens | (a) Present Value of Lot | (b) Cost of Improvements | Total (a+b) |
|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ |

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost | Amount Existing Liens | Purpose of Refinance | Describe Improvements | ☐ made  ☐ to be made |
|---|---|---|---|---|---|
| | $ | $ | | Cost: $ | |

| Title will be held in what Name(s) | Manner in which Title will be held | Estate will be held in: |
|---|---|---|
| GALYNA SVENTEK | SINGLE  WOMEN | ☑ Fee Simple  ☐ Leasehold (show expiration date) |

| Source of Down Payment, Settlement Charges and/or Subordinate Financing (explain) |
|---|
| Checking/Savings |

## III. BORROWER INFORMATION

|  | Borrower | Co-Borrower |
|---|---|---|

| Borrower's Name (include Jr. or Sr. if applicable) | Co-Borrower's Name (include Jr. or Sr. if applicable) |
|---|---|
| GALYNA SVENTEK | |

| Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| ▓-2745 | 224-578-2212 | ▓/1963 | 18 | | | | |

| ☐ Married  ☑ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Co-Borrower) no.   ages | ☐ Married  ☐ Unmarried (include single, divorced, widowed)  ☐ Separated | Dependents (not listed by Borrower) no.   ages |
|---|---|---|---|

| Present Address (street, city, state, ZIP)  ☐ Own  ☑ Rent  2  No. Yrs. | Present Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|
| 632 PLEASYRE DRIVE  Mundelein, IL 60060 | |

| Mailing Address, if different from Present Address | Mailing Address, if different from Present Address |
|---|---|

*If residing at present address for less than two years, complete the following:*

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|

| Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. | Former Address (street, city, state, ZIP)  ☐ Own  ☐ Rent  No. Yrs. |
|---|---|

| Fannie Mae Form 1003   07/05 CALYX Form Loanapp1.frm 09/05 | Page 1 of 5 | Borrower   *G. S.* Co-Borrower | Freddie Mac Form 65   07/05 |
|---|---|---|---|

| Borrower | IV. EMPLOYMENT INFORMATION | Co-Borrower |

| Name & Address of Employer | ☑ Self Employed | Yrs. on this job | Name & Address of Employer | ☐ Self Employed | Yrs. on this job |
|---|---|---|---|---|---|
| A.P. AMERICAN TR. INC 415 E. WILSON ST. Palatine, IL 60074 | | 4 yr(s) | | | |
| | | Yrs. employed in this line of work/profession 6 | | | Yrs. employed in this line of work/profession |
| Position/Title/Type of Business VISE PRESIDENT (transportation comp 847-358-4411 | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

*If employed in current position for less than two years or if currently employed in more than one position, complete the following:*

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

| Name & Address of Employer | ☐ Self Employed | Dates (from-to) | Name & Address of Employer | ☐ Self Employed | Dates (from-to) |
|---|---|---|---|---|---|
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | | Business Phone (incl. area code) |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 17,500.00 | $ | $ 17,500.00 | Rent | $ 2,500.00 | |
| Overtime | | | | First Mortgage (P&I) | | $ 3,594.79 |
| Bonuses | | | | Other Financing (P&I) | | 2,771.17 |
| Commissions | | | | Hazard Insurance | | 100.00 |
| Dividends/Interest | | | | Real Estate Taxes | | 500.00 |
| Net Rental Income | | | | Mortgage Insurance | | |
| Other (before completing, see the notice in "describe other income," below) | | | | Homeowner Assn. Dues | | |
| | | | | Other: | | |
| Total | $ 17,500.00 | $ | $ 17,500.00 | Total | $ 2,500.00 | $ 6,965.96 |

\* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

**Describe Other Income** *Notice:* Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan.

| B/C | | Monthly Amount |
|---|---|---|
| | | $ |
| | | |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp2.frm 09/05

Page 2 of 5

Borrower _C. S._
Co-Borrower _____

Freddie Mac Form 65   07/05

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed by that spouse or other person also.

Completed [✓] Jointly [ ] Not Jointly

| ASSETS<br>Description | Cash or<br>Market Value | Liabilities and Pledged Assets. List the creditor's name, address and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | | | |
| | | **LIABILITIES** | Monthly Payment &<br>Months Left to Pay | Unpaid Balance |
| *List checking and savings accounts below* | | Name and address of Company<br>**THD/CBUSA**<br>PO BOX 9714<br>GRAY TN 37615 | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union<br>**CHASE** | | | | |
| | | Acct. no. ●●●●●●●1806 | 33 /0 | 611 |
| Acct. no. ●●●●●●1644 | $        13,000 | Name and address of Company<br>**THD/CBUSA**<br>PO BOX 9714<br>GRAY TN 37615 | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union<br>**LASALLE BANK** | | | | |
| | | Acct. no. ●●●●●●4875 | 30 /0 | 593 |
| Acct. no. ●●●●●9326 | $        50,000 | Name and address of Company<br>**WASH MUTUAL/PROVIDIAN**<br>4900 JOHNSON DR<br>PLEASANTON, CA 94588 | $ Payment/Months | $ |
| Name and address of Bank, S&L, or Credit Union | | | | |
| | | Acct. no. ●●●●●7628 | 231 /0 | 308 |
| Acct. no. | $ | Name and address of Company<br>**HSBC/RHODE** | $ Payment/Months | $ |
| Stocks & Bonds (Company name/number description) | $ | | | |
| | | Acct. no. ●●●0100 | 12 /0 | 235 |
| | | Name and address of Company<br>**CHASE**<br>800 BROOKSEDGE BLVD<br>WESTERVILLE, OH 43081 | $ Payment/Months | $ |
| Life insurance net cash value<br>Face amount: $ | $ | | | |
| **Subtotal Liquid Assets** | $        63,000 | Acct. no. ●●●●4902 | 10 /0 | 40 |
| Real estate owned (enter market value from schedule of real estate owned) | $ | Name and address of Company<br>**CITI** | $ Payment/Months | $ |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. ●●●●●●8121 | 20 /0 | 28 |
| Automobiles owned (make and year) | $ | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | **Total Monthly Payments** | $        359 | |
| **Total Assets a.** | $        63,000 | Net Worth<br>(a minus b)  ==> | $        61,162 | **Total Liabilities b.** $        1,838 |

**Schedule of Real Estate Owned** (if additional properties are owned, use continuation sheet)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |

Fannie Mae Form 1003   07/05
CALYX Form Loanapp3.frm 09/05

Borrower *G. S.*
Co-Borrower _____

Freddie Mac Form 65   07/05

| VII. DETAILS OF TRANSACTION | | VIII. DECLARATIONS | | | | |
|---|---|---|---|---|---|---|

| VII. DETAILS OF TRANSACTION | |
|---|---|
| a. Purchase price | $ 895,000.00 |
| b. Alterations, improvements, repairs | |
| c. Land (if acquired separately) | |
| d. Refinance (incl. debts to be paid off) | |
| e. Estimated prepaid items | 1,890.88 |
| f. Estimated closing costs | 12,424.10 |
| g. PMI, MIP, Funding Fee | |
| h. Discount (if Borrower will pay) | |
| i. Total costs (add items a through h) | 909,314.98 |
| j. Subordinate financing | 300,000.00 |
| k. Borrower's closing costs paid by Seller | |
| l. Other Credits (explain) | |
| COUNTY TAX | 3,161.34 |
| | |
| | |
| New 2nd Mtg Closing Costs | -2,679.14 |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 595,000.00 |
| n. PMI, MIP, Funding Fee financed | |
| o. Loan amount (add m & n) | 595,000.00 |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | 13,832.78 |

**VIII. DECLARATIONS**

If you answer "Yes" to any questions a through i, please use continuation sheet for explanation.

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| | Yes | No | Yes | No |
| a. Are there any outstanding judgments against you? | ☐ | ☑ | ☐ | ☐ |
| b. Have you been declared bankrupt within the past 7 years? | ☐ | ☑ | ☐ | ☐ |
| c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | ☐ | ☑ | ☐ | ☐ |
| d. Are you a party to a lawsuit? | ☐ | ☑ | ☐ | ☐ |
| e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name and address of Lender, FHA or VA case number, if any, and reasons for the action.) | ☐ | ☑ | ☐ | ☐ |
| f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | ☐ | ☑ | ☐ | ☐ |
| g. Are you obligated to pay alimony, child support, or separate maintenance? | ☐ | ☑ | ☐ | ☐ |
| h. Is any part of the down payment borrowed? | ☐ | ☑ | ☐ | ☐ |
| i. Are you a co-maker or endorser on a note? | ☐ | ☑ | ☐ | ☐ |
| j. Are you a U. S. citizen? | ☑ | ☐ | ☐ | ☐ |
| k. Are you a permanent resident alien? | ☐ | ☑ | ☐ | ☐ |
| l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | ☑ | ☐ | ☐ | ☐ |
| m. Have you had an ownership interest in a property in the last three years? | ☐ | ☑ | ☐ | ☐ |
| (1) What type of property did you own-principal residence (PR), second home (SH), or investment property (IP)? | | | | ___ |
| (2) How did you hold title to the home-solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | ___ |

**IX. ACKNOWLEDGEMENT AND AGREEMENT**

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X  *C. Svendek* | 09.15.06 | X | |

**X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES**

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a Lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | CO-BORROWER | ☐ I do not wish to furnish this information |
|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino  ☑ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino  ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American | Race: | ☐ American Indian or Alaska Native  ☐ Asian  ☐ Black or African American |
| | ☐ Native Hawaiian or Other Pacific Islander  ☑ White | | ☐ Native Hawaiian or Other Pacific Islander  ☐ White |
| Sex: | ☑ Female  ☐ Male | Sex: | ☐ Female  ☐ Male |

| To be Completed by Interviewer This application was taken by: ☑ Face-to-face interview ☐ Mail ☐ Telephone ☐ Internet | Interviewer's Name (print or type) OLGA MATYUK | Name and Address of Interviewer's Employer Terra Financial Consulting Corp. |
|---|---|---|
| | Interviewer's Signature  *Olga Matyuk*  Date  9/15/06 | 4043 W. Dempster Street Skokie, IL 60076 |
| | Interviewer's Phone Number (incl. area code) 847-329-1001 | (P) 847-329-1001 (F) 847-676-8601 |

Fannie Mae Form 1003  07/05
CALYX Form Loanapp4.frm 09/05

Freddie Mac Form 65  07/05

MIN          I000139-0080711773-8
MERS Telephone: (888) 679-6377

*1ST*

# NOTE

April 27, 2006                    Northbrook                         IL
[Date]                            [City]                             [State]

1010 N Western Ave
Chicago, IL 60622
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $340,000.00        (this amount is called "Principal"),
plus interest, to the order of the Lender. The Lender is Irwin Mortgage Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is
entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly
rate of          7.500 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B)
of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the     1st     day of each month beginning on June 1, 2006            . I will
make these payments every month until I have paid all of the principal and interest and any other charges described below that I
may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest
before Principal. If, on May 1, 2036            , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "Maturity Date."

I will make my monthly payments at 10500 Kincaid Drive, Fishers, IN 46037
                                        or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    2,377.33        .

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a
"Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a
payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my
Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my
Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the
Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my
monthly payment unless the Note Holder agrees in writing to those changes.

49685366                                                                          0080711773
MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

VMP-5N (0207)              Form 3200 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3                 Initials: A.K.



EXHIBIT
6

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15    calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

49685366                                                                       0080711773

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
Aleksander Kulchitskiy                -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

_____ (Seal)
                                     -Borrower

*[Sign Original Only]*

49685366                                    0080711773

VMP®-5N (0207)          Page 3 of 3          Form 3200 1/01

Return To:
Irwin Mortgage Corporation
Attn: Final Documents
P.O. Box 6107
Indianapolis, IN 46206-6107

Prepared By:

Doc#:  0614255106 Fee: $52.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 05/22/2006 11:25 AM Pg: 1 of 15

SUCCESS TITLE SERVICES, INC
400 Skokie Blvd. Ste. 380
Northbrook, IL 60062

——————————— [Space Above This Line For Recording Data] ———————————

# MORTGAGE

MIN 1000139-0080711773-8

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "Security Instrument" means this document, which is dated April 27, 2006
together with all Riders to this document.
(B) "Borrower" is Aleksander  Kulchitskiy, an unmarried man.

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee
under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an
address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

49685367                                                        0080711773

ILLINOIS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3014  1/01

VMP® -6A(IL) (0010)
Page 1 of 15                    Initials: A.K

VMP MORTGAGE FORMS - (800)521-7291



**(D) "Lender"** is Irwin Mortgage Corporation

Lender is a Corporation
organized and existing under the laws of The State of Indiana
Lender's address is 10500 Kincaid Drive, Fishers, IN  46037

**(E) "Note"** means the promissory note signed by Borrower and dated April 27, 2006
The Note states that Borrower owes Lender Three Hundred Forty Thousand and 00/100
Dollars
(U.S. $ 340,000.00          ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than May 1, 2036

**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard
to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage
loan" under RESPA.

49685367                                                                          0080711773

⬤ -6A(IL) (0010)              Page 2 of 15         Initials: A.K.              Form 3014  1/01

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the

County                                    [Type of Recording Jurisdiction]
of Cook                                   [Name of Recording Jurisdiction]:

LOT 26 (EXCEPT THE EAST 17 FEET OF SAID LOT 26 WHICH WAS CONDEMNED FOR WIDENING OF WESTERN AVENUE) IN BLOCK 2 IN CHARLES COUNSELMAN'S SUBDIVISION OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 1, TOWNSHIP 39 NORTH, RANGE 13, EAST OF THE THIRD PRINCIPAL MERIDIAN, IN COOK COUNTY, ILLINOIS.

Parcel ID Number: 16-01-415-042                which currently has the address of
1010 N Western Ave                                              [Street]
Chicago                          [City], Illinois 60622          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items

49685367                                                        0080711773

Initials: A.K.

VMP®-6A(IL) (0010)          Page 3 of 16                         Form 3014  1/01

pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts

49685367                                                                          0080711773

Initials: A.K.

VMP®-6A(IL) (0010)                    Page 4 of 15                                      Form 3014  1/01

due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

49685367                                                                    0080711773

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

49685367

-6A(IL) (0010)     Page 6 of 15     Initials: _____     Form 3014   1/01

0080711773

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

49685367                                                                            0080711773

-6A(IL) (0010)                          Page 7 of 15          Initials: A.K          Form 3014  1/01

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

49685367

-6A(IL) (0010)                          Page 8 of 15                     Initials: A. K.   0080711773

                                                                        Form 3014   1/01

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

49685367                                                                                    0080711773

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

49685367                                                                    0080711773

Initials: A.K.

-6A(IL) (0010)                    Page 10 of 15                    Form 3014  1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

49685367                                                      0080711773

VMP®-6A(IL) (0010)                                Page 11 of 15             Initials: _A.K._             Form 3014   1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

49685367                                                                              0080711773

-6A(IL) (0010)                    Page 12 of 15                    Initials: A K                    Form 3014   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**25. Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

49685367

VMP ®-6A(IL) (0010)

Page 13 of 15

Initials: A K     0080711773

Form 3014   1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          *Alex Kulchitskiy* _____ (Seal)
                                          Aleksander Kulchitskiy          -Borrower

_____          _____ (Seal)
                                                                          -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                         -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                         -Borrower

_____ (Seal)           _____ (Seal)
                        -Borrower                                         -Borrower

49685367                                  0080711773

 -6A(IL) (0010)          Page 14 of 15          Form 3014   1/01

STATE OF ILLINOIS,
I, The Undersigned / Michelle G. Los                                    County ss: Cook
, a Notary Public in and for said county and
state do hereby certify that

Aleksander Kulchitskiy

personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instrument as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this   27TH  day of  April , 2006

My Commission Expires: 09/20/06

_____
Notary Public

OFFICIAL SEAL
MICHELLE G. LAS
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. SEPT. 20, 2006

49685367

VMP -6A(IL) (0010)                    Page 15 of 15                    Initials: A K,  0080711773

                                                                       Form 3014  1/01

08 CV 3032

JUDGE SHADUR

MAGISTRATE JUDGE COLE

| NOTE |

MIN        1000139-0080711823-1
MERS Telephone: (888) 679-6377

April 27, 2006                    Northbrook                    IL
*Date*                              *City*                       *State*

                                 1010 N Western Ave
                                 Chicago, IL 60622
                                 *Property Address*

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 85,000.00          (this amount will be called "principal"), plus interest, to the order of the Lender. The Lender is Irwin Mortgage Corporation

. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note will be called the "Note Holder."

## 2. INTEREST

I will pay interest at a yearly rate of          12.375 %.

Interest will be charged on that part of principal which has not been paid. Interest will be charged beginning on the date of this Note and continuing until the full amount of principal has been paid.

## 3. PAYMENTS

I will pay principal and interest by making payments each month of U.S. $          898.93          .

I will make my payments on the          1st          day of each month beginning on June 1 2006          . I will make these payments every month until I have paid all of the principal and interest and any other charges, described below, that I may owe under this Note. If, on May 1, 2036 I still owe amounts under this Note, I will pay all those amounts, in full, on that date.

I will make my monthly payments at 10500 Kincaid Drive, Fishers, IN  46037 or at a different place if required by the Note Holder.

## 4. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any of my monthly payments by the end of          10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment, but not less than U.S. $ 1.00          and not more than U.S. $ 50.00          . I will pay this late charge only once on any late payment.

### (B) Notice from Note Holder

If I do not pay the full amount of each monthly payment on time, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date I will be in default. That date must be at least 10 days after the date on which the notice is mailed to me or, if it is not mailed, 10 days after the date on which it is delivered to me.

### (C) Default

If I do not pay the overdue amount by the date stated in the notice described in (B) above, I will be in default. If I am in default, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount.

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (D) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back for all of its costs and expenses to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 5. THIS NOTE SECURED BY A MORTGAGE

In addition to the protections given to the Note Holder under this Note, a Mortgage, dated April 27, 2006 , protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Mortgage describes how and under what conditions I may be required to make immediate payment in full of all amounts that I owe under this Note.

49686135                                                    0080711823

**ILLINOIS** - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT          Form 3914

Page 1 of 2

 -75(IL) (0204)          VMP MORTGAGE FORMS - (800)521-7291          Initials: A K,

| EXHIBIT |
| 7 |

**6. BORROWER'S PAYMENTS BEFORE THEY ARE DUE .**

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in a letter that I am doing so. A prepayment of all of the unpaid principal is known as a "full prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

I may make a full prepayment or a partial prepayment without paying any penalty. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no delays in the due dates or changes in the amounts of my monthly payments unless the Note Holder agrees in writing to those delays or changes. I may make a full prepayment at any time. If I choose to make a partial prepayment, the Note Holder may require me to make the prepayment on the same day that one of my monthly payments is due. The Note Holder may also require that the amount of my partial prepayment be equal to the amount of principal that would have been part of my next one or more monthly payments.

**7. BORROWER'S WAIVERS**

I waive my rights to require the Note Holder to do certain things. Those things are: (A) to demand payment of amounts due (known as "presentment"); (B) to give notice that amounts due have not been paid (known as "notice of dishonor"); (C) to obtain an official certification of nonpayment (known as a "protest"). Anyone else who agrees to keep the promises made in this Note, or who agrees to make payments to the Note Holder if I fail to keep my promises under this Note, or who signs this Note to transfer it to someone else also waives these rights. These persons are known as "guarantors, sureties and endorsers."

**8. GIVING OF NOTICES**

Any notice that must be given to me under this Note will be given by delivering it or by mailing it by certified mail addressed to me at the Property Address above. A notice will be delivered or mailed to me at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by certified mail to the Note Holder at the address stated in Section 3 above. A notice will be mailed to the Note Holder at a different address if I am given a notice of that different address.

**9. RESPONSIBILITY OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each of us is fully and personally obligated to pay the full amount owed and to keep all of the promises made in this Note. Any guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to do these things. The Note Holder may enforce its rights under this Note against each of us individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note. Any person who takes over my rights or obligations under this Note will have all of my rights and must keep all of my promises made in this Note. Any person who takes over the rights or obligations of a guarantor, surety, or endorser of this Note (as described in Section 7 above) is also obligated to keep all of the promises made in this Note.


_Alex Kulchitskiy_ _____ (Seal)    _____ (Seal)
Aleksander Kulchitskiy                    -Borrower                                            -Borrower


_____ (Seal)    _____ (Seal)
                                 -Borrower                                            -Borrower


_____ (Seal)    _____ (Seal)
                                 -Borrower                                            -Borrower


_____ (Seal)    _____ (Seal)
                                 -Borrower                                            -Borrower


*[Sign Original Only]*


49686135                                                                         0080711823

VMP-75(IL) (0204)                        Page 2 of 2                              Form 3914

Doc#: 0614255107 Fee: $34.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 05/22/2006 11:02 AM Pg: 1 of 6

Return To:
Irwin Mortgage Corporation
Attn: Final Documents
P.O. Box 6107
Indianapolis, IN 46206-6107

Prepared By:

## MORTGAGE

MIN 1000139-0080711823-1

THIS MORTGAGE is made this 27th          day of April, 2006                    , between the Mortgagor,
Aleksander  Kulchitskiy, an unmarried man.

**This mortgage is subordinate
to the mortgage dated** _04/27/06_
**and in the amount of** _340,000_

(herein "Borrower"), and the Mortgagee,
Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's
successors and assigns). MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.   Irwin Mortgage Corporation

("Lender") is organized and existing under the laws of The State of Indiana
and has an address of 10500 Kincaid Drive, Fishers, IN  46037

WHEREAS, Borrower is indebted to Lender in the principal sum of U.S. $85,000.00                    , which
indebtedness is evidenced by Borrower's note dated April 27, 2006          and extensions and renewals
thereof (herein "Note"),  providing for monthly installments of principal and interest, with the balance of indebtedness, if not
sooner paid, due and payable on May 1, 2036                    ;
TO SECURE to Lender the repayment of the indebtedness evidenced by the Note, with interest thereon; the payment of all
other sums,  with  interest  thereon,  advanced  in  accordance  herewith  to  protect  the  security  of  this  Mortgage;  and  the
performance of the covenants and agreements of Borrower herein contained, Borrower does hereby mortgage, grant and convey
to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the
following described property located in the County of Cook
State of Illinois:

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.
SUBJECT TO COVENANTS OF RECORD.

49686136                                                          0080711823

ILLINOIS - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT WITH MERS

VMP-76N(IL) (0204)          Form 3814
Page 1 of 5               Amended 2/01
Initials: _A.K._
VMP MORTGAGE FORMS - (800)521-7291



Parcel ID #16-01-415-042

which has the address of 1010 N Western Ave                                    [Street]

Chicago                    [City], Illinois 60622        [ZIP Code] (herein "Property Address");

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents all of which shall be deemed to be and remain a part of the property covered by this Mortgage; and all of the foregoing, together with said property (or the leasehold estate if this Mortgage is on a leasehold) are hereinafter referred to as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Mortgage; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Mortgage.

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property, and that the Property is unencumbered, except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest.** Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Mortgage and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.

If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Mortgage that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Mortgage.

If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.

Upon payment in full of all sums secured by this Mortgage, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Mortgage.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.

4. **Prior Mortgages and Deeds of Trust; Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Mortgage, and leasehold payments or ground rents, if any.

5. **Hazard Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

49686136                                                                    0080711823

                                                    Initials: A.K.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

**6. Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Mortgage is on a leasehold. If this Mortgage is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

**7. Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Mortgage, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Mortgage, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Mortgage. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

**8. Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

**9. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.

**10. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Mortgage granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Mortgage by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

**11. Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Mortgage, but does not execute the Note, (a) is co-signing this Mortgage only to mortgage, grant and convey that Borrower's interest in the Property to Lender under the terms of this Mortgage, (b) is not personally liable on the Note or under this Mortgage, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the Note without that Borrower's consent and without releasing that Borrower or modifying this Mortgage as to that Borrower's interest in the Property.

**12. Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Mortgage shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Mortgage shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

**13. Governing Law; Severability.** The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Mortgage. In the event that any provision or clause of this Mortgage or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Mortgage or the Note which can be given effect without the conflicting provision, and to

49686136                                                                                                          0080711823

Initials: _AK_

this end the provisions of this Mortgage and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

**14. Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and of this Mortgage at the time of execution or after recordation hereof.

**15. Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

**16. Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Mortgage. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Mortgage.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Mortgage. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Mortgage without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Mortgage, including the covenants to pay when due any sums secured by this Mortgage, Lender prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage, foreclosure by judicial proceeding, and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the nonexistence of a default or any other defense of Borrower to acceleration and foreclosure. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option, may declare all of the sums secured by this Mortgage to be immediately due and payable without further demand and may foreclose this Mortgage by judicial proceeding. Lender shall be entitled to collect in such proceeding all expenses of foreclosure, including, but not limited to, reasonable attorneys' fees and costs of documentary evidence, abstracts and title reports.

**18. Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Mortgage due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Mortgage discontinued at any time prior to entry of a judgment enforcing this Mortgage if: (a) Borrower pays Lender all sums which would be then due under this Mortgage and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Mortgage; (c) Borrower pays all reasonable expenses incurred by Lender in enforcing the covenants and agreements of Borrower contained in this Mortgage, and in enforcing Lender's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Mortgage shall continue unimpaired. Upon such payment and cure by Borrower, this Mortgage and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

**19. Assignment of Rents; Appointment of Receiver.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender shall be entitled to have a receiver appointed by a court to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Mortgage. The receiver shall be liable to account only for those rents actually received.

**20. Release.** Upon payment of all sums secured by this Mortgage, Lender shall release this Mortgage without charge to Borrower. Borrower shall pay all costs of recordation, if any.

**21. Waiver of Homestead.** Borrower hereby waives all right of homestead exemption in the Property.

49686136

(VMP)-76N(IL) (0204)

Page 4 of 6

Initials: A. K.

0080711823

Form 3814

**REQUEST FOR NOTICE OF DEFAULT**
**AND FORECLOSURE UNDER SUPERIOR**
**MORTGAGES OR DEEDS OF TRUST**

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Mortgage to give Notice to Lender, at Lender's address set forth on page one of this Mortgage, of any default under the superior encumbrance and of any sale or other foreclosure action.

IN WITNESS WHEREOF, Borrower has executed this Mortgage.

_____ (Seal)          _____ (Seal)
Aleksander Kulchitskiy                -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                        -Borrower

_____ (Seal)          _____ (Seal)
                                      -Borrower                                        -Borrower

                                                                    *(Sign Original Only)*

STATE OF ILLINOIS,                                      County ss: Cook
  I, The Undersigned /Michelle G. Los
a Notary Public in and for said county and state do hereby certify that
          Aleksander Kulchitskiy

, personally known to me to be the same person(s) whose name(s) subscribed to the foregoing instrument, appeared before me this day in person, and acknowledged that he/she/they signed and delivered the said instruments as his/her/their free and voluntary act, for the uses and purposes therein set forth.

Given under my hand and official seal, this    27TH    day of    April , 2006    .

My Commission Expires: 09/20/06

                                              _____
                                              Notary Public

49686136                                                               0080711823

VMP-76N(IL) (0204)                    Page 5 of 6                          Form 3814

Exhibit "A"
IL Second Mortgage, w/MERS
Given By: Aleksander Kulchitskiy

LOT 26 (EXCEPT THE EAST 17 FEET OF SAID LOT 26 WHICH WAS CONDEMNED FOR WIDENING OF WESTERN AVENUE) IN BLOCK 2 IN CHARLES COUNSELMAN'S SUBDIVISION OF THE SOUTHEAST 1/4 OF THE NORTHEAST 1/4 OF THE SOUTHEAST 1/4 OF SECTION 1,TOWNSHIP 39 NORTH,RANGE 13,EAST OF THE THIRD PRINCIPAL MERIDIAN,IN COOK COUNTY,ILLINOIS.